Adams v. A.J. Ballard Jr. Tire & Oil Co., 2006 NCBC 9
Adams v. BP Prods. N. Am., Inc., 2006 NCBC 9
Barnett v. BP Prods. N. Am., Inc., 2006 NCBC 9

---

STATE OF NORTH CAROLINA

CARTERET COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
01 CVS 1271

BOBBIE ADAMS, TINA ADAMS, individually and as Guardian Ad Litem of CODY ADAMS and LINDSEY ADAMS, MARJORIE G. ADAMS, ROY THOMAS ADAMS, ROBBIE ADAMS, ANEDA ADAMS, individually and as Guardian Ad Litem of DANIEL ADAMS and DREW ADAMS, ELIZABETH BEALL, individually and as Guardian Ad Litem of AMBER N. ENGLEBY, NATHAN TOMMY GOLDEN, MARTHA A.BELL, individually and as Guardian Ad Litem of CHRIS BELL, SUNNY HERRING, ELTON GUY BELL, JR., DAVID PRESTON BELL, DAVID CARY BROOKS, STEPHANIE DANIELS, individually and as Guardian Ad Litem of CHARLES DANIELS, DARRIN DANIELS, AMBER DANIELS, DALLAS FRAZIER, and KRISTEN FRAZIER, MARVIN FRAZIER, NAN MORTON FIELDS, DAVID FIELDS, SAMANTHA FIELDS, TROY FIELDS, VICTORIA S. GAMBLE, ROSEANNE COLÓN, SHEILA COLÓN, MARGUERITE GUTHRIE GILLIKIN, ANNA KIM MORTON HADLEY, individually and as Guardian Ad Litem of NICHOLAS SCOTT HADLEY, COREY ALLEN HADLEY, FRANKLIN LEE JENKINS, ALBERT C. LEWIS, JR., MARGARET J. LEWIS, CHRISTEL ANN LEWIS GEIER, JACKOLINE S. LEWIS, FRONIE LEWIS, JOE LEWIS, individually and as Guardian Ad Litem of CHELSEA LEWIS, SHARON GARNER, individually and as Guardian Ad Litem of JOHN SALTER and BRANDON SALTER, NATASHA SALTER, JUDY McNAMARA, CHARLES MIZELLE, individually and as Guardian Ad Litem of CARLA DANETTE MIZELLE, DONNA MIZELLE, ANTHONY R. MORTON, individually and as Guardian Ad Litem of JACOB T. MORTON, SOMMER L. MORTON, DANNY MARK MORTON, individually and as Guardian Ad Litem of VICTORIA LYNN MORTON, DANIELLE MARIE MORTON, GURTHEY MORTON, MILON C. MORTON, SR., SHEILA MORTON, MILON C. MORTON, JR., THURMAN G. MORTON, JR., individually and as Guardian Ad Litem of MATTHEW MORTON, JONI M. MORTON, JULIE SYKES, individually and as Guardian Ad Litem of MIKAYLA SYKES, VERNON MORTON, NANCY MORTON, VIRGINIA B. MORTON, ROBERT J. NOLAN, DEBORAH A. NOLAN, ROBERT L. NOLAN, DANIEL NOLAN, DOUGLAS NORRIS, LOU ANN NORRIS, ANDREA NORRIS, RICHARD NORRIS, individually and as Guardian Ad Litem of BRANDON NORRIS and LYDIA NORRIS, NANCY NORRIS, STEPHANIE NORRIS, EMMA P. O'NEAL, GREGORY RIGGS, individually and as Guardian Ad Litem of ASHLEY B. RIGGS and SONYA WILLIAMSON, individually and as Guardian Ad Litem of APRIL MOLOSKY, KYLE D. SAWYERS, LOIS SAWYERS, DONALD W. SHOPTAUGH, CHERYL SHOPTAUGH, individually and as Guardian Ad Litem of FAITH D. SHOPTAUGH, CASEY A. SHOPTAUGH, ANDREW E. SHOPTAUGH, LOLA G. SMITH, FRANCINE WINBERRY, PAUL R. SMITH, individually and as Guardian Ad Litem of PAUL R. SMITH, JR., CONNIE T. SMITH, individually and as Guardian Ad Litem of CAMERON S. THOMPSON, SHERRI SMITH, JAMES ANDREW SMITH, JUDI FARLOW, JERRY E. TAYLOR, SR., LAVERNE S. TAYLOR, JERRY TAYLOR, JR., RICHARD TAYLOR, and JENNIFER VanDEVOORD,

Plaintiffs,

v.

A. J. BALLARD, JR. TIRE & OIL COMPANY, INCORPORATED, JOYCE D. BALLARD, individually, as trustee for ALBERT CHRISTOPHER BALLARD, and as executrix of the estate of ALBERT J. BALLARD, JR., ALBERT CHRISTOPHER BALLARD, GARY ALLEN BALLARD, and FISHER STORES, INC.,

          Defendants.

---

STATE OF NORTH CAROLINA

CARTERET COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
03 CVS 912

BOBBIE ADAMS, TINA ADAMS, individually and as Guardian Ad Litem of CODY ADAMS and LINDSEY ADAMS, MARJORIE G. ADAMS, ROY THOMAS ADAMS, ROBBIE ADAMS, ANEDA ADAMS, individually and as Guardian Ad Litem of DANIEL ADAMS and DREW ADAMS, ELIZABETH BEALL, individually and as Guardian Ad Litem of AMBER N. ENGLEBY, NATHAN TOMMY GOLDEN, MARTHA A. BELL, individually and as Guardian Ad Litem of CHRIS BELL, SUNNY HERRING, ELTON GUY BELL, JR., DAVID PRESTON BELL, DAVID CARY BROOKS, CLARENCE DANIELS, CLAUDIA DANIELS, CHRISTOPHER SCOTT DANIELS, CHRISTIE CANNON, CHARLES DANIELS, STEPHANIE DANIELS, individually and as Guardian Ad Litem of CHARLES A. DANIELS, DARRIN DANIELS, AMBER DANIELS, DALLAS FRAZIER, and KRISTEN FRAZIER, MARVIN FRAZIER, FREDERICK SHAWN DEFEO, JENNIFER MARIE DEFEO, individually and as Guardian Ad Litem of DAVID SHANE DEFEO, NAN MORTON FIELDS, DAVID FIELDS, SAMANTHA FIELDS, TROY FIELDS, VICTORIA S. GAMBLE, SHEILA COLON, ROSEANNE COLON, MARGUERITE GUTHRIE GILLIKIN, WALLACE A. GUTHRIE, SR., MARILYN W. GUTHRIE, WALLACE A. GUTHRIE, JR., ELAINA B. GUTHRIE, ANNA KIM MORTON HADLEY, individually and as Guardian Ad Litem of NICHOLAS SCOTT HADLEY, COREY ALLEN HADLEY, BRETT HARSTINE, individually and as Guardian Ad Litem of TYLER HARSTINE AND TALON HARSTINE, JENNIFER HARSTINE, FRANKLIN LEE JENKINS, individually and as Guardian Ad Litem of FRANKLIN R. JENKINS and SAMANTHA WEST, ALBERT C. LEWIS, JR., MARGARET J. LEWIS, CHRISTEL ANN LEWIS GEIER, CHARLES P. JACOBI, JR., DORIS H. JACOBI, JACKOLINE S. LEWIS, individually and As Executrix of the Estate of FRONIE LEWIS, JOE LEWIS, individually and as Guardian Ad Litem of CHELSEA LEWIS, SHARON GARNER, individually and as Guardian Ad Litem of BRANDON SALTER, JOHN SALTER, JR., NATASHA SALTER, JUDY McNAMARA, JAMES SCOTT McNAMARA as Guardian Ad Litem of JAMES SCOTT McNAMARA, JR., TABITHA LYNN McNAMARA, and CODY RAY McNAMARA, CHARLES MIZELLE, individually and as Guardian Ad Litem of CARLA DANETTE MIZELLE, DONNA MIZELLE, ANTHONY R. MORTON, individually and as Guardian Ad Litem of JACOB T. MORTON, SOMMER L. MORTON, DANNY MARK MORTON, individually and as Guardian Ad Litem of VICTORIA LYNN MORTON, DANIELLE MARIE MORTON, GURTHEY MORTON, MILON C. MORTON, SR., SHEILA MORTON, MILON C. MORTON, JR., THURMAN G. MORTON, JR., individually and as Guardian Ad Litem of MATTHEW MORTON, JONI M. MORTON, JULIE SYKES, individually and as Guardian Ad Litem of MIKAYLA SYKES, VERNON MORTON, NANCY MORTON, VIRGINIA B. MORTON, ANTHONY MURRAY, WANDA MURRAY, ROBERT A. MURRAY, RONDA E. NIXON, JAMES NIXON, JONATHAN NIXON, ROBERT J. NOLAN, DEBORAH A. NOLAN, ROBERT L. NOLAN, DANIEL NOLAN, DOUGLAS NORRIS, LOU ANN NORRIS, ANDREA

NORRIS, RICHARD NORRIS, individually and as Guardian Ad Litem of LYDIA NORRIS, NANCY NORRIS, BRANDON NORRIS, STEPHANIE SKRABACZ, EMMA P. O'NEAL, GREGORY IGGS, individually and as Guardian Ad Litem of ASHLEY B. RIGGS, SONYA WILLIAMSON, individually and as Guardian Ad Litem of APRIL MOLOSKY, KYLE D. SAWYERS, LOIS SAWYERS, DONALD W. SHOPTAUGH, CHERYL SHOPTAUGH, individually and as Guardian Ad Litem of FAITH D. SHOPTAUGH, CASEY A. SHOPTAUGH, ANDREW E. SHOPTAUGH, LOLA G. SMITH, FRANCINE WINBERRY, PAUL R. SMITH, individually and as Guardian Ad Litem of PAUL R. SMITH, JR., CONNIE T. SMITH, individually and as Guardian Ad Litem of CAMERON S. THOMPSON, SHERRI SMITH, JAMES ANDREW SMITH, JUDI FARLOW, JOHN R. STEWART, JR., VELMA A. STEWART, RODNEY CHARLES STEWART, individually and as Guardian Ad Litem of JORDAN WAYNE STEWART, JENNIFER C. STEWART, JERRY E. TAYLOR, SR., LAVERNE S. TAYLOR, JERRY TAYLOR, JR., ELIZABETH TAYLOR, individually and as Guardian Ad Litem of FELICIA TAYLOR and SHAINA TAYLOR, RICHARD TAYLOR, and JENNIFER VANDEVOORD, individually and as Guardian Ad Litem of ALEXIS TAYLOR, KEVIN L. UNDERWOOD, VELMAE. UNDERWOOD, individually and as Guardian Ad Litem of KRISTIN N. UNDERWOOD, KEVIN L. UNDERWOOD, JR. and TABITHA L. NIXON,

Plaintiffs,

v.

BP PRODUCTS NORTH AMERICA, INC.; BP OIL COMPANY; SHELL OIL COMPANY; EXXON MOBIL CORPORATION; ATLANTIC RICHFIELD COMPANY; SUN OIL COMPANY; CHEVRON OIL COMPANY; CHEVRON U.S.A, INC.; PHILLIPS PETROLEUM COMPANY; COLONIAL OIL INDUSTRIES, INC.; COLONIAL TERMINALS, INC; TOSCO CORPORATION; WACCAMAW TRANSPORT, INC., and BALLARD TRANSPORT, INC.,

Defendants.

---

STATE OF NORTH CAROLINA

CARTERET COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
03 CVS 1124

LINDA BARNETT, individually and as Guardian Ad Litem of MEGAN WILLIS, SAMANTHA BARNETT and CHRISTOPHER BARNETT, and DEANNA L. ECHTMAN,

Plaintiffs,

v.

BP PRODUCTS NORTH AMERICA, INC.; BP OIL COMPANY; SHELL OIL COMPANY; EXXON MOBIL CORPORATION; ATLANTIC RICHFIELD COMPANY; SUN OIL COMPANY; CHEVRON OIL COMPANY; CHEVRON U. S. A, INC.; PHILLIPS PETROLEUM COMPANY; COLONIAL OIL INDUSTRIES, INC.; COLONIAL TERMINALS, INC; TOSCO CORPORATION; WACCAMAW TRANSPORT, INC.; and BALLARD TRANSPORT, INC.,

Defendants.

---

**ORDER AND OPINION**

{1}     These cases are before the Court on numerous motions argued over an extensive period of time. It has taken the Court some time to get the record in the position it should be for the determination of the issues by this Court and the appellate courts. During the course of this litigation a public policy debate over the use of methyl tertiary-butyl ether ("MTBE"), an additive used to increase oxygen content in gasoline, has taken place that has delayed the court's consideration of the issues until the legislative bodies on the federal and state level had taken some position on the legislation before them. The issues in these cases are difficult from a legal perspective, complex from a proof perspective, important from an environmental standpoint, and riddled with public policy concerns. Not insignificantly, they are important to the plaintiffs whose well water has been impacted. The outcome of these cases could impact the retail price of gasoline in this state. It will also affect the sources of recovery for well owners whose water supplies are contaminated by leaking underground fuel storage tanks.

{2}     These cases present three key issues with many subparts. They are:

     1)     May refiners be held liable for underground storage tank leaks or spills at sites they do not own?

     2)     What causes of action and statutes of limitation and repose apply to leaks or spills that contaminate drinking water under adjacent property?

     3)     What state regulations determine when drinking water is contaminated?

{3}     Not all of the defendants are in the same position. Complaints were filed against different defendants at different times. The cases originally involved two different sites owned by different defendants and supplied by different refiners. Not all of the plaintiffs have similar claims or damages. They have been impacted in different ways. There are issues that affect some parties and do not affect others. For those reasons, the Court will attempt to identify the undisputed facts and answer the questions that it believes will be of importance to the parties, the public, and the appellate courts.

*Hopf & Higley, P.A. by James F. Hopf; Lewis & Roberts, P.L.L.C. by Gary W. Jackson, James A. Roberts, III; Baron & Budd, PC by Carla Burke, Celeste Evangelisti, David Green, and Scott Summy for Plaintiffs.*

*Ward and Davis, LLP by Catherine Piwowarski and John A.J. Ward for Defendants Ballard Transport, Inc., A.J. Ballard, Jr. Tire and Oil Company, A.J. Ballard, Jr. (deceased), Joyce D. Ballard, Albert Christopher Ballard, and Gary Allen Ballard.*

*Harris, Creech, Ward & Blackerby, PA by Thomas E. Harris; Kirkland & Ellis by John J. Amberg, J. Andrew Langan, and Thomas J. Morel for Defendants BP Products North America Inc. and Atlantic Richfield Company.*

Tennille, Judge.

{4}      For purposes of addressing the issues in some logical fashion, the Court will describe the parties and the procedural posture of the pending motions and then follow the outline below.

## FACTUAL AND STRUCTURAL FRAMEWORK

I.       What is MTBE and why is it used in the refining of some gasoline?

II.      Clean air v. clean water—what are the public policy concerns?

III.      How does North Carolina address the problem created by leaking Underground Storage Tanks (USTs)?

IV.      How does North Carolina regulate drinking water purity?

V.       What is the factual history of well contamination in the Broad Creek Community?

VI.      What is the factual history of the Ballard Site?

VII.      What are the additional relevant facts?

VIII.      What does the record demonstrate as to the involvement of the individual Ballard Defendants?

## LEGAL QUESTIONS

I.       Are refiners that sell gasoline containing MTBE free from liability when that gasoline is released from USTs as a result of the negligence of others?

    A.       May the proximate causation barrier be overcome by finding "forseeability" of negligent conduct by owner/operators of USTs?

    B.       May the proximate causation barrier be overcome by holding refiners strictly liable for adding MTBE to gasoline?

    C.       May the proximate causation barrier be overcome by applying the products liability statute?  Is summary judgment appropriate on the issue of whether selling gasoline containing MTBE constitutes negligent conduct?

II.      What statutes of limitations and repose apply in this case?

    A.       Do the statutes of repose apply to sales of gasoline containing MTBE?

    B.       What statutes of limitation apply when gasoline leaks from an UST: (a) as to the refiner selling the gas, and (b) as to the tank owner/operator responsible for the leak?

    C.       If the statutes of limitation and repose apply, have Plaintiffs raised an issue of fact with respect to the question of whether a leak occurred at the Ballard Site within a period not barred by the statute of limitations or the statute of repose?

III.      Which state regulated drinking water standards determine the basis for liability in contamination cases, and what triggers any applicable statute of limitations in those cases?

IV.      Do Plaintiffs have a claim that survives summary judgment as to any one of the Ballard Defendants?

V.       Are Defendants entitled to summary judgment as a matter of law with respect to the *res ipsa*, fraud, nuisance, trespass, willful and wanton negligence, and OPHSCA claims?

## SUMMARY OF DECISIONS

{5}     The Court has concluded that:

1)     Refiners who do not own or control retail or wholesale locations are not responsible for injuries resulting from actions of the owners of the USTs located at those sites. The intervening negligence of tank owner/operators insulates refiners from liability.

2)     Even if refiners are not insulated from liability, the issue of whether or not refiners are negligent in using MTBE as an oxygenate in gasoline would be an issue upon which neither side would be entitled to summary judgment.

3)     The interrelationship between the level of contamination providing the basis for liability and the triggering of the running of the statute of limitations is critical. If the contamination level giving rise to liability were poorly defined, for example by taste or odor, and the statute of limitations were to start to run when the poorly defined contamination level is reached, well owners might not get the water tested and might not be aware of a problem until after the statute of limitations has run. If the level is more precisely defined, for example by the maximum allowable concentration levels as defined by state regulations, and confirmed by testing, the statute of limitations should not begin to run until the higher levels are confirmed.

4)     The maximum concentration levels for specific chemicals have been set in health standards and thus should be reliable in protecting users of the well water.[1]    As a corollary, when a well owner ceases to use her well as a result of perceived contamination of any kind from a particular source, the statute of limitations should begin to run at that point.

5)     If Refiner Defendants were not insulated from liability, the ten-year and six-year statutes of repose would apply to product liability claims arising out of the sales of gasoline by the Refiner Defendants and begin to run when the refiners transfer title to the product to the retailer or wholesaler and bar any claims arising out of sales outside the repose period.

6)     The ten-year and six-year statutes of repose apply to product liability claims against the Ballard Defendants and began to run whenever there was a leak which resulted in contamination of Plaintiffs' wells and bar any claims for product liability arising from leaks or spills outside the repose period.

7)     The three-year statute of limitations applies to the simple negligence claims against the Ballard Defendants and begins to run when an injury occurs as defined below.

8)     The three-year statute of limitations applies to the trespass and nuisance claims against the Ballard Defendants and begins to run when an injury occurs as defined below.

9)     The state regulations for ground water govern whether a well owner has a claim for contamination. A cause of action based upon contamination of well water by a specific chemical does not accrue until the well owner becomes aware that the concentration levels for that specific chemical have exceeded state standards. Accordingly the plaintiffs whose wells have been affected by contamination from MTBE or benzene above the state levels have a cause of action which has accrued and which is maintainable if suit was filed within the applicable statutes of limitation. Those plaintiffs who were affected by wells which

have not evidenced contamination from MTBE or benzene above state levels do not have a cause of action which has yet accrued and those claims are subject to dismissal for that reason. Those claims could be asserted later if the contamination levels exceed permissible levels.

10) Refiner liability, if any, would be limited to those wells which, when tested, showed MTBE present at levels higher than 200 parts per billion ("ppb"), the maximum allowable concentration as defined by state regulations. The Ballard Defendants' liability may extend to wells with other contamination (i.e. benzene) in excess of state regulations. The specific guidelines for maximum allowable concentration levels for chemicals specified in the state regulations are chosen for their certainty and reliability. They provide a bright line test for contamination based on science. At best, only three wells used by Plaintiffs have MTBE contamination in excess of levels permitted by state regulations.

11) There is insufficient evidence in this record to establish that the Refiner Defendants sold product containing MTBE to the Ballard Site within the three-, six-, or ten-year periods of limitation and repose, which gasoline leaked or was spilled in a manner causing injury to Plaintiffs' wells.

12) There is sufficient evidence in this record to raise an issue of fact with respect to whether there were leaks or spills on the Ballard Site which continue to cause contamination of some wells in the Broad Creek Community, for which some, but not all, of the Ballard Defendants may be liable. The wells that may have been impacted are confined to the Central District as defined herein.

13) All defendants are entitled to summary judgment on the *res ipsa* and fraud claims.

14) With respect to the 1987 leak at the Ballard Site, the notice provided to Plaintiffs by DENR was in compliance with state regulations and was sufficient notice of the existence of a problem to start the statute of limitations running with respect to claims arising out of that incident. Accordingly, the statute of limitations has run on claims arising out of that leak except for claims associated with the failure of the responsible parties to remediate or for continuing trespass and nuisance.

## PARTIES

{6} Plaintiffs are citizens and residents, or former citizens and residents, of the Broad Creek Community, located in Newport, Carteret County, North Carolina. It is a close-knit community. Although the claims are filed individually, Plaintiffs have pursued the litigation jointly. Each plaintiff alleges contamination of his or her well or water supply. Different wells have different levels of contamination and different kinds of contamination, and different plaintiffs allegedly suffered different injuries. Some plaintiffs have connected to other available water supplies. Some have not. All claim to have been impacted by the contamination of their water supply by fuel leaks from two sites. Some plaintiffs have claims for personal injury, and some are limited to property damage. Attached hereto as Appendix A and incorporated herein is a schedule showing each plaintiff, the well(s) he or she used, the levels of MTBE found in the well(s), and the levels of benzene found in the well(s). [2]

{7} Defendant A.J. Ballard, Jr. Tire & Oil Company, Incorporated ("Ballard Tire & Oil Co."), is a

North Carolina corporation, with its principal place of business located at 3500 Clarendon Blvd., New Bern, Craven County, North Carolina. At all times relevant to the allegations in the Complaint, Defendant Ballard Tire & Oil Co. was authorized to conduct, and did conduct, business in the State of North Carolina.

{8}     Defendant A.J. Ballard, Jr. was a citizen and resident of New Bern, Craven County, North Carolina. He is deceased, and his estate has been substituted as a party.

{9}     Defendant Joyce D. Ballard is a citizen and resident of New Bern, Craven County, North Carolina. Plaintiffs brought suit against Joyce Ballard both as an individual and in her capacity as trustee for Albert Christopher Ballard.

{10}    Defendant Albert Christopher Ballard is a citizen and resident of Pitt County, North Carolina.

{11}    Defendant Gary Allen Ballard is a citizen and resident of Craven County, North Carolina.

{12}    Defendants A.J. Ballard, Jr., Joyce D. Ballard, Albert Christopher Ballard, and Gary Allen Ballard will be collectively referred to herein as the "Individual Ballard Defendants" unless individual treatment is warranted. Defendants Ballard Tire & Oil Co. and the Individual Ballard Defendants will be collectively referred to herein as the "Ballard Defendants" unless individual treatment is warranted. At times relevant to the allegations in the Complaint, various of the Ballard Defendants were the owners, occupiers, and/or operators of real property located on Highway 24, Post Office Box 1465, City of Newport, Carteret County, North Carolina, upon which is located a gas station or facility known as "First Stop Food Store No. 2," which sells fuel and other petroleum products. This will sometimes be referred to as the "Ballard Site".

{13}    Defendant BP Products North America, Inc. is a Maryland corporation, with its principal place of business in Chicago, Illinois. Defendant BP Oil Company is a Delaware corporation, with its principal place of business in Cleveland, Ohio. Defendant BP Oil sold product to the Ballard Site.

{14}    Defendant Atlantic Richfield Company ("ARCO"), at the time the Complaint was filed, was a Delaware corporation, with its principal place of business in Chicago, Illinois. ARCO has merged with and is now a subsidiary of BP Oil. ARCO sold product to the Ballard Site.

{15}    BP Products North America, Inc., BP Oil Company, and ARCO will hereinafter be collectively referred to as "Refiner Defendants." These defendants sold product to the Ballard Site up until 2002. The other oil company defendants, who sold to the Fisher Site and the owners of the Fisher Site, have resolved their disputes with Plaintiffs. Those defendants are no longer parties to this lawsuit.

{16}    Defendant Fisher Stores, Inc. ("Fisher Stores") is a North Carolina corporation with its principal place of business located at 110 Riverdale Road, Craven County, New Bern, North Carolina ("Fisher Site"). At all times relevant to the allegations in the Complaint, Defendant Fisher Stores was authorized to conduct, and did conduct, business in the State of North Carolina. All claims brought against Defendant Fisher Stores have been resolved.

{17}    Defendant Shell Oil Company is a Delaware corporation, with its principal place of business in Houston, Texas. Shell Oil Company sold product to the Fisher Site.

{18}    Defendant Exxon Mobil Corporation is a New Jersey corporation, with its principal place of business in Houston, Texas. Exxon Mobil Corporation sold product to the Fisher Site.

{19}    Defendant Chevron Oil Company is a California corporation, with its principal place of business in San Francisco, California. Defendant Chevron U.S.A., Inc. is a Pennsylvania corporation, with its principal place of business in San Ramon, California. Chevron U.S.A., Inc. sold product to the Fisher

Site.

{20}     Defendant Phillips Petroleum Company is a Delaware corporation, with its principal place of business in Bartlesville, Oklahoma.  Phillips Petroleum Company sold product to the Fisher Site.

{21}     Defendant Tosco Corporation is a Nevada corporation, with its principal place of business in Stanford, Connecticut.  Tosco Corporation sold product to the Fisher Site.

{22}     Defendant Sun Oil Company is a Delaware corporation, with its principal place of business in Philadelphia, Pennsylvania.  Sun Oil Company sold product to the Fisher Site.

{23}     No claims remain against the other defendants.


# FACTS

I.        MTBE:  What it is and why it is used in some gasoline

{24}     Methyl tertiary-butyl ether ("MTBE") is a chemical compound produced from the chemical reaction of methanol and isobutylene.  MTBE is commonly and almost exclusively used as an additive to motor gasoline and is part of a group of chemicals called "oxygenates," which increase oxygen content when added to gasoline.  Greater oxygen levels allow gasoline to burn more completely.  More efficient combustion reduces harmful tailpipe emissions from motor vehicles.

{25}     Gasoline refiners began using MTBE to replace lead in gasoline in the late 1970s, with the adoption of the U.S Environmental Protection Agency ("EPA")'s tetraethyl lead phase-down program.  Prior to the program's adoption, approximately 250,000 tons of tetraethyl lead were added annually to gasoline to increase octane ratings and, consequently, engine efficiency.  Agency for Toxic Substances and Disease Registry, U.S. Dept. of Health & Human Servs. – Public Health Service, Toxicological Profile for Lead, Draft for Public Comment, at 271 (Sept. 2005), *available at* http://www.atsdr.cdc.gov/toxprofiles/tp13.pdf.  The EPA adopted the phase-down program after it determined that lead additives "would impair the performance of emission control systems installed on motor vehicles and that lead particle emission from motor vehicles presented a significant health risk to urban populations."  *Id.*  The effect of the phase-down program was to reduce lead content in gasoline to less than 1% of the amount used in 1970, when lead content levels in gasoline peaked.  *Id.*

{26}    The U.S. Congress amended the Clean Air Act ("CAA") in 1990 and in doing so banned the use of gasoline containing lead or lead additives as fuel in motor vehicles.  *Id.*  The EPA incorporated the statutory ban in 1996 in a rule redefining unleaded gasoline to contain only trace amounts of lead and prohibiting the use of lead additives in unleaded gasoline.  *Id.*  The 1990 amendments also created more oxygenate requirements for gasoline in many areas in order to reduce harmful emissions.  Since the adoption of the 1990 CAA amendments, MTBE has been used at greater concentrations in gasoline to meet the increased oxygenate requirements of the Act.[3]  As a result, the use of reformatted gasoline ("RFG"), containing oxygenates such as MTBE, is said to have produced significant annual reductions of smog-forming pollutants and toxins.  *See* U.S. Environmental Protection Agency*, Methyl Tertiary Butyl Ether (MTBE)*, *available at* http://www.epa.gov/mtbe/gas.htm.

II.     Clean Air v. Clean Water

{27}     The use of MTBE as an oxygenate in reformulated gasoline has provoked a national debate.  As a result, the EPA appointed the Blue Ribbon Panel on Oxygenates in Gasoline (the "Blue Ribbon Panel") in 1998 to investigate the air quality benefits and water quality concerns associated with oxygenates in gasoline.  The Report of the Blue Ribbon Panel provides a concise summary of the policy issues posed by the inclusion of MTBE in gasoline products:

> The Clean Air Act requires that RFG contain 2% oxygen, by weight.  Over 85% of RFG contains the oxygenate methyl tertiary butyl ether (MTBE) and approximately 8% contains ethanol - a domestic fuel-blending stock made from grain and potentially from recycled biomass waste.  There is disagreement about the precise role of oxygenates in attaining the RFG air quality benefits although there is evidence from the existing program that increased use of oxygenates results in reduced carbon monoxide emissions, and it appears that additives contribute to reductions in aromatics in fuels and related air benefits.  It is possible to formulate gasoline without oxygenates that can attain similar air toxics reductions, but less certain that, given current federal RFG requirements, all fuel blends created without oxygenates could maintain the benefits provided today by oxygenated RFG.
>
> At the same time, the use of MTBE in the program has resulted in growing detections of MTBE in drinking water, with between 5% and 10% of drinking water supplies in high oxygenate use areas showing at least detectable amounts of MTBE.  The great majority of these detections to date have been well below levels of public health concern, with approximately one percent rising to levels above 20 ppb.  Detections at lower levels have, however, raised consumer taste and odor concerns that have caused water suppliers to stop using some water supplies and to incur costs of treatment and remediation.   The contaminated wells include private wells that are less well protected than public drinking water supplies and not monitored for chemical contamination.  There is also evidence of contamination of surface waters, particularly during summer boating seasons.
>
> The major source of groundwater contamination appears to be releases from underground gasoline storage systems (UST).  These systems have been upgraded over the last decade, likely resulting in reduced risk of leaks.  However, approximately 20% of the storage systems have not yet been upgraded, and there continue to be reports of releases from some upgraded systems, due to inadequate design, installation, maintenance, and/or operation.  In addition, many fuel storage systems (e.g. farms, small above-ground tanks) are not currently regulated by U.S. EPA.  Beyond groundwater contamination from UST sources, the other major sources of water contamination appear to be small and large gasoline spills to ground and surface waters, and recreational water craft - particularly those with older motors - releasing unburned fuel to surface waters.

Blue Ribbon Panel, Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline, at 1-2 (Sept. 15, 1999) (footnote omitted), *available at* http://www.epa.gov/otaq/consumer/fuels/oxypanel/r99021.pdf.  The Blue Ribbon Panel summarized its findings as follows:

> Based on its review of the issues, the Panel made the following overall findings:
>
> •       The distribution, use, and combustion of gasoline poses risks to our environment and public health.
>
> •       RFG provides considerable air quality improvements and benefits for millions of US citizens.

- The use of MTBE has raised the issue of the effects of both MTBE alone and MTBE in gasoline. This panel was not constituted to perform an independent comprehensive health assessment and has chosen to rely on recent reports by a number of state, national, and international health agencies. What seems clear, however, is that MTBE, due to its persistence and mobility in water, is more likely to contaminate ground and surface water than the other components of gasoline.

- MTBE has been found in a number of water supplies nationwide, primarily causing consumer odor and taste concerns that have led water suppliers to reduce use of those supplies. Incidents of MTBE in drinking water supplies at levels well above EPA and state guidelines and standards have occurred, but are rare. The Panel believes that the occurrence of MTBE in drinking water supplies can and should be substantially reduced.

- MTBE is currently an integral component of the U.S. gasoline supply both in terms of volume and octane. As such, changes in its use, with the attendant capital construction and infrastructure modifications, must be implemented with sufficient time, certainty, and flexibility to maintain the stability of both the complex U. S. fuel supply system and gasoline prices.

*Id*. at 2-3.

{28}     The debate has not subsided or been resolved. During the last session of Congress, the entire energy package of legislation was held up by a debate over the inclusion of a provision which would have eliminated oil company liability for use of MTBE in reformulated gasoline. S*ee* 151 Cong. Rec. H5772 (daily ed. July 13, 2005) (debate on the motion offered by Congresswoman Capps to instruct the House managers not to agree to a provision limiting MTBE liability for refiners at the conference meeting on the Energy Policy Act of 2005). That provision was ultimately eliminated from the legislation. *See* Energy Policy Act of 2005, Pub. L. No. 109-58 (2005). Had it passed, the claims in this case against the defendant oil companies would have been barred.

{29}     North Carolina also considered an outright ban on gasoline containing MTBE. The General Assembly did pass legislation which bans the use of MTBE in gasoline in North Carolina beginning in 2008.[4] The legislation also directs the Department of Natural Resources to investigate how North Carolina could ban the use of MTBE without impacting the state's fuel supply and orders it to work with other states in the Southeast in doing so. The legislation provides in pertinent part:

> The Secretary of Environment and Natural Resources and the Commissioner of Agriculture shall jointly study the feasibility and advantages of a coordinated regional approach for the phaseout of methyl tertiary butyl ether (MTBE) as an additive to motor fuel in the southeast region of the United States. The study shall consider the potential impacts on fuel supply and availability and the potential benefits and costs associated with the use of MTBE. In the course of the study, the Secretary and the Commissioner shall consult with the following:
>
> (1) Other southeastern states, including Alabama, Georgia, Kentucky, Mississippi, South Carolina, Tennessee, and Virginia.
>
> (2) Refiners, suppliers, distributors, transporters, and retailers of motor fuel and liquid fuel pipeline operators.
>
> (3) Consumer, environmental, and other public interest groups.

(4) The United States Environmental Protection Agency and other relevant governmental agencies.

2005 N.C. Sess. Laws 93.

{30} In summary, the public policy issues surrounding the use of MTBE are unresolved. The competing concerns of clear air, clean water, and affordable fuel are extraordinarily difficult to reconcile; the data surrounding the benefits and detriments of oxygenates is not clear; and the impact of changes in gasoline composition on fuel supply and costs remains uncertain. With gasoline prices skyrocketing above three dollars a gallon, affordable fuel is not an insignificant concern. The North Carolina General Assembly has elected to ban MTBE, but it has done so under a regime that permits its continued use for several years into the future and recognizes the distribution problems created by the ban. The General Assembly has not enacted legislation creating liability for the use of MTBE as an oxygenate, nor has it amended the laws and regulations governing USTs to impose liability on refiners for leaks from USTs of gasoline containing MTBE. While the State has adopted the future ban on MTBE in gasoline, it has not altered the regulations governing drinking water. *See infra* ¶¶ 38-41. It is against this public policy background that the legal issues in this case arise.

III. How NC addresses the problem created by leaking underground storage tanks

{31} As the implementing agency for the Federal Underground Storage Tank Program, as authorized by 42 U.S.C. § 6991 *et seq.*, the Underground Storage Tank section of the Waste Management division of the North Carolina Department of Environmental and Natural Resources ("DENR") regulates most underground storage tanks in the state. DENR is authorized to implement federal regulations on behalf of the EPA under the Federal UST program, as promulgated under Part 280, Title 40, of the Code of Federal Regulations.

{32} In the event of a spill causing a release of at least 25 gallons of petroleum into the environment surrounding a tank or causing a sheen on nearby water, state regulations for reporting and cleanup are triggered. Within 24 hours, the owner/operator of the UST system is required to contain and clean up any spill or overfill and report the incident to DENR. 15A NCAC 2N. 0604; 15A NCAC 2N. 0702.

{33} Following the initial response, the owner/operator is required to conduct initial abatement measures, which include taking corrective measures aimed at preventing further releases as well as containing the migration and remedying the hazards of released substances. 15A NCAC 2N .0703 (Jan. 2002). It must also take further measurements to confirm the presence of a release to the environment and investigate the possible presence of free product.[5] *Id.* These initial abatement steps must be summarized in a report submitted to DENR within 14 days of confirmation of the release, and a more detailed report characterizing the site and providing more information on the release must be submitted within 45 days. 15A NCAC 2N .0703-.0704.

{34} Whenever free product is detected, the UST owner/operators must—"to the maximum extent practicable"—remove all free product and submit a free product removal report to DENR within 45 days of confirming the release. 15A NCAC 2N .0703-.0705. If there is evidence that groundwater wells have been affected or if free product is found to be in need of recovery, state and federal regulations require

further investigation into the full extent of the effects of the spill on nearby groundwater. 15A NCAC 2N .0706. A separate report detailing the results of that investigation must then be filed. *Id.*

{35}    Ultimately, DENR may require the owner/operator to compile a "corrective action plan," which may be approved only after DENR has determined that it will "adequately protect human health, safety, and the environment." 15A NCAC 2N .0707 (adopting 40 CFR § 280.66 by reference). The owner/operator is responsible for implementing the plan as modified by DENR. *Id.* Whenever nearby groundwater quality has been degraded, the goal of any corrective action must be the "restoration to the level of the standards [as set out in N.C. Admin. Code Title 15A, Rule 02L .0202], or as closely thereto as is economically and technologically feasible." 15A NCAC 02L .0106. These are the same water quality requirements referred to below and used by the Court in this decision. DENR's Underground Storage Tank division's Correction Action Program ("CAP") oversees the assessment and cleanup process. The CAP is primarily responsible for collecting well samples and monitoring the work of environmental consultants hired to oversee the clean up process. *See* Underground Storage Tanks Section Website, *at* http://ust.enr.state.nc.us/corract.html.

{36}    In the event of a leak requiring a corrective action plan, the regulations require DENR to provide notice to the public "by means designed to reach those members of the public directly affected by the release and the planned corrective action" and may hold a public meeting to consider comments from the public on the proposed action before the plan is put in place. 15A NCAC 2N .0708 (adopting 40 CFR § 280.67 by reference).

{37}    The groundwater quality rules also prescribe specific action to be taken by owner/operators of petroleum USTs in the event of a discharge or release. Under those rules, owner/operators are required to undertake corrective action as discussed above. 15A NCAC 02L .0115. They must also conduct a risk-based assessment, classifying the risk of any known discharge or release as high, intermediate, or low. The classifications take into account the effect that the release has had on nearby surface water, groundwater, and water supply wells. Remediation under a corrective action plan is required if the release is classified as an intermediate or high risk.[6]

IV.    Regulation of drinking water purity in North Carolina

{38}    The General Assembly, under N.C.G.S. § 143-214.1, authorized the Environmental Management Commission ("Commission") to develop and adopt specific water quality standards applicable to groundwaters of the state. 15 NCAC 02L .0101 (2006). The standards adopted by the Commission in Subchapter 2L are applicable "to all activities or actions, intentional or accidental, which contribute to the degradation of groundwater quality" except in specific circumstances not relevant in this case. *Id.* The stated intent of the rules is to "protect the overall high quality of North Carolina's groundwaters to the level established by the standards." 15 NCAC 02L .0103 (2006).

{39}    North Carolina classifies groundwater into three categories: Class GA, Class GSA, and Class GC. Class GA groundwaters are best used as an "[e]xisting or potential source of drinking water supply for humans." 15A NCAC 02L .0201(1). They are considered suitable for drinking in their natural state, but may require treatment "to improve quality related to natural condition." *Id.* Those groundwaters containing 250 mg/l or less of chloride are classified as GA. 15A NCAC 02L .0302(1). Class GSA groundwaters are best used as an "[e]xisting or potential source of water supply for potable mineral water

and conversion to fresh waters." A5 NCAC 02L .0201(2). These waters have higher concentrations of chloride due to natural condition but may be suitable for use as potable water after treatment "to reduce concentrations of naturally occurring substances." *Id.* Those groundwaters containing greater than 250 mg/l of chloride are classified as GSA. 15A NCAC 02L .0302(2). Finally, class GC groundwaters are best used as "a source of water supply for purposes other than drinking, including domestic uses by humans." 15A NCAC 02L .0201(3). These waters are those that do not meet the qualifications of classification as GA or GSA and for which "efforts to improve groundwater quality would not be technologically feasible, or not in the best interests of the public." *Id.* These groundwaters are classified on a case by case basis. *Id.*

{40}     The Commission promulgated groundwater quality standards in Title 15A, Subchapter 2L, Rule .0202 of the N.C. Administrative Code. The specified standards are "the <u>maximum allowable concentrations</u> resulting from any discharge of contaminants to the land or waters of the state, which may be tolerated without creating a threat to human health or which would otherwise render the groundwater unsuitable for its intended best usage." 15A NCAC 02L .0202(a) (emphasis added). The rule lists specific concentrations at which a contaminant creates a threat to human health or causes groundwater to be unsuitable for its intended best usage as classified under Rule .0201.[7] It is significant that an owner/operator responsible for a corrective action plan must have as a goal the restoration of water quality to this level. *See supra* ¶35.

{41}     For Class GA and Class GSA groundwaters, the groundwater standards are the least of:
    (1)  Systematic threshold concentration . . .;
    (2)  Concentration which corresponds to an incremental lifetime cancer risk of $1\times10^{-6}$;
    (3)  Taste threshold limit value;
    (4)  Odor threshold limit value;
    (5)  **Maximum contaminant level** [as specific under Rule .0202(g)-(h)]; or
    (6)  National secondary drinking water standard.

15A NCAC .02L .0202(d). The rules do not define "taste threshold limit value" or "odor threshold limit value." The well-defined maximum contaminant level for MTBE is 0.2 milligrams per liter—or 200 parts per billion ("ppb"). 15A NCAC 02L .0202(g). The well-defined maximum contaminant level for benzene is .001 milligrams per liter—or 1 ppb. *Id.* Almost every plaintiff's well exceeds the maximum for benzene. Only three wells have exceeded the maximum for MTBE. *See* App. A.


V.     Well contamination in Broad Creek

{42}     The Court has compiled Appendix A using information provided by Plaintiffs. The Appendix, together with exhibits 6A, 6B, 7A, and 7B to Mr. Cornette's report, is the best way to get a picture of where and what kind of contamination exists in the Broad Creek Community. Hazardous chemicals other than benzene and MTBE were found in some of the wells. Since the levels of benzene were so high, the Court has elected not to deal with the other contamination. The benzene levels alone render the water unusable under state regulations.

{43}     As Appendix A makes clear, the wells contaminated with MTBE above the level of 200 ppb are also contaminated with levels of benzene significantly in excess of permitted levels. The permitted levels

of benzene are significantly lower than those for MTBE. Where the MTBE levels drop off on Appendix A, the benzene levels show an almost identical drop. It is also clear that in all wells the levels of benzene present exceed permitted contamination levels by a far greater amount than the MTBE levels exceed permitted amounts. This raises several questions. First, if benzene in fact travels slower than MTBE, is the benzene contamination older? Second, could it be that the use of MTBE did not contribute to the contamination here anymore than non-MTBE, benzene-containing products?

{44}  Plaintiffs' expert, Anthony Brown divided the Broad Creek community into three separate areas— the Eastern, Central, and Western Districts. Brown conceded in his deposition that the evidence available does not support the conclusion that it is more likely than not that leaks from the Ballard Site contributed to contamination in the eastern and western regions. (Brown Dep., at 304-06, 323.) No evidence has been put forward to refute that conclusion. Therefore, the Court confines its inquiry to the Central District and the wells situated therein.

{45}  When viewing Appendix A it is clear that, with the exception of WSW-33, which is in the Western District, the next group of wells, with MTBE contamination levels of 83-65 ppb and consisting of WSW-2, 3, 4, 5, 8, and 16, are geographically concentrated in the same areas as the more highly contaminated wells in the Central District. When the truly *de minimus* level wells of 22, 25, 27, 28, 29, and 34 are viewed together, there is a boundary to the MTBE contamination which runs along Lewis Street. Thus the area of concentration is clearly in the Central District in an area bounded by South Guthrie and Guthrie Drive on the west and Lewis Street on the east. Water supply well 11 appears to be outside this pattern. All of this is consistent with Plaintiffs' expert's testimony, as discussed above.

{46}  Appendix A demonstrates the difficulty of selecting a threshold for contamination that is not based upon verifiable violations of the maximum allowable concentration levels for specified chemicals. Plaintiffs' wells contain vastly different levels of MTBE contamination—from 1.2 to 562 ppb. It would be virtually impossible to decide a contamination level, either within this case or between this case and other cases, without using the maximum contamination levels. There would be no consistency and no guidelines to enforce liability unless the maximum contamination levels are used as opposed to taste and odor.

{47}  Appendix A also demonstrates the difficulty of assessing liability against refiners for using MTBE when, as in this case, the levels of contamination from benzene are equal to or greater than the MTBE contamination. Imposing strict liability for using MTBE would impose liability for all clean up on the refiners who would not be held liable under the statutory scheme for other contaminants such as benzene. This is not a case in which MTBE has raced ahead of other contaminants.

{48}  It should be noted that MTBE can enter the water supply from various sources. In this case, for instance, there is evidence of release(s) from the nearby Pender Park Fuel Market and of the existence of incineration pits in the Broad Creek Community at which gasoline was used. (Brown Exp. Report, at 51-52; Cornette Rebuttal Exp. Report, at 7-8.) Also, Plaintiffs' expert testified that lower volume releases in the Broad Creek Community occurred from the use of gasoline as an accelerant in fires, lawnmower spills, and auto accidents. (Dep. of Anthony Brown, at 255-56.)[8]

VI.  Factual history of the Ballard Site

{49}  Plaintiffs argue in their briefs that the evidence overwhelmingly supports the conclusion that

gasoline released from the USTs at the Ballard Site caused their properties and drinking wells to become contaminated. (Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, at 2 ("Plaintiffs' Brief in Support").) They cite to the following evidence. In April 1984 an Underground Storage Tank system, owned and operated by Ballard Tire & Oil Co, was installed at the Ballard Site. (Plaintiffs' Brief in Support, at 3.) Three years later, in August of 1987, contamination in the form of petroleum hydrocarbons was discovered at the sight during routine tests by Carteret County health officials of water supplied by a nearby groundwater well. (Plaintiffs' Brief in Support, at 4, 6-7.) That contamination was confirmed in September 1987 when DENR, which investigated the reported contamination by digging a borehole downgradient of the USTs, detected a petroleum odor. *Id.* No evidence of contamination, however, was revealed by a similar borehole believed to be dug upgradient of the Ballard Site USTs. (Aff. of Rick Shiver, Ex. H (Letter from Charles Wakild, Regional Supervisor, DENR, to A.J. Ballard (Dec. 3, 1987)).) Well sampling analytical results later confirmed the presence of petroleum hydrocarbons. *Id.* A.J. Ballard subsequently reported to the DENR inspector that he had discovered and repaired a leaking flange gasket on the submersible pump of his regular leaded underground storage system. *Id.*

{50} On December 3, 1987, DENR issued a Notice of Non-compliance, informing Mr. Ballard that he was in violation of North Carolina regulations because DENR had found petroleum hydrocarbons in nearby groundwater "caus[ing] the water supply to become unsafe or unsuitable for its current use." *Id.* DENR directed Ballard to 1) conduct approved tightness tests on the First Stop UST; 2) construct monitoring wells to define the direction of groundwater flow and the extent of petroleum contaminants and to determine the impact of plumes on nearby wells, surface waters, and utilities; 3) contain the movement of the contaminant plume; and 4) remove the contaminants from the subsurface. *Id.* DENR gave notice of the problem to the surrounding community. Plaintiffs concede that the gasoline that leaked in 1987 did not contain MTBE. It would have contained benzene.

{51} A separate incident occurred in November 1990, when Chris Ballard, while working as an employee, observed a stain, which had resulted from an overflow during a delivery of gasoline to the Ballard Site. (Aff. of Albert Christopher Ballard (June 25, 2005).) The driver responsible was terminated immediately after the incident. *Id.* The spill was not reported to DENR. (Dep. of Albert Christopher Ballard, at 158 (March 8, 2005).) Only 5.6 gallons of gasoline was spilled in the November 1990 incident. There are no other reported leaks or spills at the Ballard Site.

{52} Groundwater Management Assocs. ("GMA"), an environmental consultant hired by the Ballards to respond to the Notice of Non-compliance, determined that the 1987 release was caused by the leaking flange gasket that had been reported to DENR. (Aff. of Rick Shiver, Ex. A (Report of Groundwater Management Associates to DENR, Hydrological Site Characterization at First Stop Food Store, at 12 (June 14, 1988)).) GMA proposed that DENR require no further corrective action other than continued monitoring. *Id.* at 15. DENR responded that merely monitoring the existing contamination would not be sufficient and that remedial action would be necessary. (Aff. of Rick Shiver, Ex. V (In re A.J. Ballard, Jr. Tire & Oil Co. (N.C. Envtl. Mgmt. Comm'n June 3, 1992) ("Assessment of Civil Penalties for Continuing Violations of Underground Water Quality Standards: GW 91-09")).)

{53} On June 3, 1992, DENR assessed civil penalties against Ballard Tire & Oil Co. in the amount of $149,634.05 for the continuous violation of North Carolina groundwater quality standards and for failing to adequately contain the release and remove the resulting contamination. *Id.* at 11. Up to that time, the Ballards had failed to successfully draft and implement an approved corrective action plan as required by

state and federal law, despite repeated requests by DENR that they do so. *Id.* at 2-9. On March 21, 1994, A.J. Ballard entered into a Consent Agreement and Order to take corrective action and to restore the groundwaters degraded by the release. (Aff. of Rick Shiver, Ex. W (In re Mr. A.J. Ballard, Jr., GW 98-095FT, at 2 (N.C. Envtl. Mgmt. Comm'n June 19, 1998) ("Findings and Decision and Assessment of Civil Penalties")).) On June 24, 1998, DENR assessed additional civil penalties against the Ballards in the amount of $5,220.66 for violations of regulations governing USTs and UST systems at the Ballard Site. *Id.*

{54} In 2000, some plaintiffs noticed taste and odor problems in their well water. Many had tests performed to identify the problem. Those well test results are shown on Appendix A. While most of the wells were contaminated with some hydrocarbon from some source, only three wells showed MTBE above state permitted levels. In October 2002, GMA compiled a report that concluded that the ***most likely*** source of contamination in the Broad Creek area was from the Ballard Site. GMA's report stated that "[c]ollectively, these data indicate to GMA that the [Ballard Site] is the most likely source of most or all of the groundwater contamination being investigated in the Broad Creek community." (Aff. of Steven K. Campbell, Ex. 3 (May 25, 2005) (GMA, An Assessment of Hydrogeology & Groundwater Quality, at 27 (Oct. 21, 2002) (prepared for DENR as part of GMA's assessment of contamination in the Broad Creek Community and its efforts to identify of the possible sources of that contamination)).)[9]

{55} The UST system was eventually removed from the Ballard Site in April 2004. According to a closure report dated August 5, 2004, 505.98 tons of petroleum-contaminated soil was removed from the site during a total of three excavation events. Report of Applied Resource Management, P.C., Under Ground Storage Tank Closure Report for the First Stop #2, at 4-5 (Aug. 5, 2004).

{56} Another unrelated confirmed leak occurred at the Fisher Site in 1997. Claims as to the Fisher Site are no longer at issue in this case. *See supra* ¶ 15. Therefore, the 1997 spill is not at issue here and does not provide grounds for the liability of the remaining defendants, whose liability here, if any, can only stem from spills or releases at the Ballard Site.

VII.    Additional Facts

{57} It should be noted that, as originally filed, these cases involved allegations of leaks at both locations, the Ballard Site and the Fisher Site. Claims arising out of the separately owned Fisher Stores site have been resolved. The only claims at issue here are the claims of contamination from the Ballard Site. The fact remains that some plaintiffs alleged their wells were contaminated from the Fisher Site.

{58} For purposes of the pending motions, the Court has accepted certain facts as undisputed or given Plaintiffs the benefit of facts alleged as required on a motion to dismiss or for summary judgment. *See infra* ¶¶ 60-62. The following appear to be the key facts which the Court believes are undisputed or which the parties are entitled to have accepted as true at this stage:

1)      Gasoline contains many contaminants, including benzene, toluene, and others. The presence of those contaminants at certain levels constitutes a hazard to health.

2)      MTBE is added to some gasoline as an oxygenate. At levels at or above 200 ppb it constitutes a hazard to health. MTBE is more soluble in water than other contaminants contained in gasoline and therefore may migrate farther and faster than other contaminants.

3)      MTBE has a distinct and undesirable odor and taste. Its presence in water is easily

detectable.

4)    MTBE is not used as an oxygenate in regular leaded gasoline.

5)    In 1987 a leak occurred in an underground storage tank at the Ballard Site.  The regular leaded gasoline which leaked from the tank on that occasion did not contain MTBE and thus could not be the source of MTBE contamination in the Broad Creek Community.  It could be the source of other contamination.

6)    Another spill, which was discovered in November 1990 by Christopher Ballard, resulted from overflow during a delivery of gasoline to the Ballard Site.  Only 5.6 gallons of gasoline was spilled.

7)    Of all the wells tested in the Broad Creek Community only three water supply wells contain levels of MTBE in excess of the levels permitted by state regulation.  Those are water supply wells 6, 8, and 11.  Those three wells also contained other contaminants found in gasoline, such as benzene, that rendered the water contaminated.  Other wells in the community contained some MTBE but at levels permitted under state regulations.  Some wells showed negligible MTBE contamination but showed other contaminants from gasoline in excess of levels permitted under state regulations.

8)    Water Supply Wells 6, 8, and 11 were used by the following families, as delineated by the Affidavits filed by Plaintiffs on April 20, 2006, and May 5, 2006:  Morton (Virginia), Lewis, Beall, Defeo, and Sylvia Lewis, on behalf of Plaintiff Emma P. O'Neal. [10]  The Lewis family connected to the public water supply in 1992—eight years before tests indicated contamination levels in excess of state standards.  (Aff. of Margaret Lewis.)  The Beall family connected to the public water supply on October 2, 2000, a year before tests indicated contamination levels in excess of state standards.  (Aff. of Elizabeth Beall.)  The Defeo family moved away from the Broad Creek Community several years before contamination was discovered.  (Aff. of Jennifer Defeo.)  The Morton family connected to the public water supply on November 3, 2000, a year before tests discovered contamination levels in excess of state standards.  (Aff. of Virginia Morton.)

VIII.    Individual Ballard Defendants

{59}    In addition to claims brought against the Refiner Defendants and Ballard Tire & Oil Co., claims remain against the Individual Ballard Defendants.  A.J. Ballard, Jr. and Joyce Ballard purchased the Ballard Site in April 1983.  In September 1984, they conveyed ownership of the property and, it appears, have had no ownership interest in the property as individuals since that conveyance. (Ballard Defs.' Br. in Supp. of Mot. for Summ. J., at 36 & Ex. B.)  Since that time the property has been owned by Gary Allen Ballard and Joyce Ballard, in her capacity as Trustee for Albert Christopher Ballard.  From the time of the conveyance up until the Complaint was filed, the property was leased to Ballard Tire & Oil Co., which subleased the property to others. (Ballard Defs.' Br. in Supp. of Mot. for Summ. J., at 36 & Ex. C & D.)  A.J. Ballard, Jr. had all of the dealings with DENR in connection with the Site.  As an individual the

evidence of his involvement would be sufficient to keep him in the case.

## Procedural posture and pending motions

{60}     The Refiner Defendants have filed a motion to dismiss pursuant to Rule 12(b)(6) and have also filed a motion for summary judgment. The Ballard Defendants have filed a motion to dismiss and a motion for summary judgment. Plaintiffs have filed a motion for summary judgment against all defendants.

{61}     In deciding the motions to dismiss the Court has followed the guidelines set forth by our appellate courts. When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted." *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). In doing so, the court must treat the allegations in the complaint as true. *See Hyde v. Abbott Lab., Inc*., 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996). The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that the plaintiff is entitled to no relief under any set of facts which could be proved in support of the claim. *Id.* When considering a motion under Rule 12(b)(6), the court is not required to accept as true any conclusions of law or unwarranted deductions of fact in the complaint. *Sutter v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). Where the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts which defeat any claim, that claim should be dismissed under Rule 12(b)(6). *See Hudson Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 511 S.E.2d 309 (1999). When applying this standard, the court must keep in mind that when fraud is alleged, the circumstances constituting fraud must be plead with particularity. N.C. R. Civ. P. 9(b); *see also Terry v. Terry*, 302 N.C. 71, 273 S.E.2d 674 (1981).

{62}     In deciding the motions for summary judgment the court has followed the guidelines set forth by our appellate courts. A Rule 56 motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). A "genuine issue" is one that "can be proven by substantial evidence" and a "material fact" is one that "would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982). The moving party may prevail if it meets its burden "(1) of proving an essential element of the opposing party's claim is non-existent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Id.* Once the moving party has met this burden, the non-moving party must demonstrate with specific facts that a genuine issue of material fact exists for trial or show a valid excuse for failing to do so—the non-moving party "may not rest upon the mere allegations of his pleadings." N.C. R. Civ. P. 56(c); Lowe, 305 N.C. at 369-70, 289 S.E.2d at 366.

{63}     The cases are in the unusual posture of having both motions to dismiss and summary judgment motions pending for several reasons. First, it appeared at one point that Congress would pass legislation restricting suits against refiners for using MTBE. That legislation stalled and then was abandoned. Second, while this court has concluded that there are some bases for granting the Rule 12(b)(6) motions, there are novel questions of law which could result in some change in the law in the appellate courts. Accordingly, through its case management orders, the Court directed the parties to proceed with a phased

discovery which would focus first on which plaintiffs had been impacted, how they had been impacted, and the source of any contamination. Discovery with respect to the medical records of plaintiffs and their individual monetary claims was left for a later date on the premise that such discovery would be expensive and time consuming, resulting in waste if there were insurmountable legal barriers to liability. In retrospect, that phased discovery has been efficient and has put these cases in a posture where the appellate courts can review them and, if there are issues to be tried, give the parties and the Court guidance on the applicable law to be used at trial.

{64}    Also pending are several procedural motions directed to the state of the record and the admissibility of certain evidence. The Court will address those issues as they become pertinent to the substantive issues discussed below.

## ANALYSIS
### I.
### INTERVENING NEGLIGENCE
### & REFINER LIABILITY
### A.

{65}    The first and perhaps least complex question raised by the pending motions is whether or not refiners, who do not own or control a UST, may nonetheless be held liable for negligence if the UST owner causes a spill or leak resulting in contamination of underground water supplies. The Court believes the answer is no.

{66}    It is an unavoidable fact that there would be no injury, no contamination of water, without the intervening negligence of a tank owner/operator (in this case the alleged negligence of the Ballard Defendants). No court of this state and no legislation enacted by the General Assembly has placed liability on refiners for leaks or spills at sites not controlled or owned by the refiners. To the contrary, this state has enacted a very specific statutory scheme to deal with leaks from USTs. *See supra* ¶¶ 31-37. That scheme recognizes that the proximate cause of injury in the leaking UST situation is the negligence, if any, of the owner/operator of the tank. Put differently, proximate causation is attributed to the person or entity responsible for the discharge of the contaminant into the ground.

{67}    Gasoline contains contaminants which are hazardous to health if ingested. MTBE is but one of those contaminants. It is singled out in this litigation, as it has been in other cases, because it migrates farther and faster than other chemicals in gasoline, thus permitting it to reach underground water supplies with greater frequency than other chemicals. Other chemicals migrate and pollute underground water, but they are slower to move and not as soluble in water. If there is to be some litmus test which separates one harmful chemical component from another that standard should be determined by the appellate courts which to date have not created any such distinction. Nor can this court ascertain what the standard would be that would lead to refiner liability in some cases involving leaks and not in others. What is clear in this case is that Plaintiffs' wells all contained benzene at levels substantially higher than state regulations permit. This is not a case where MTBE has outrun other contaminants and contaminated wells not affected by other components of gasoline.

{68}    Even if this were a case where MTBE outran other contaminants, a multitude of questions would still have to be resolved in order to establish a standard for liability. Is there a migration rate that would trigger liability? If so, should not that be a part of the liability and clean-up scheme enacted by the

legislature? Where is the cutoff? What would the law dictate be done where, as in this case, there are other contaminants present in the water supply? How would the cost of cleanup be assessed as between the negligent owner/operator and the refiner? Would the refiner be liable for the entire clean up including other contaminants, an outcome not heretofore existent? Would the judicially created liability supercede the General Assembly's statutory solution? What if the cause of the spread of contamination is the failure to remediate?

{69}    The General Assembly could have exacted part of the cost of cleanup from refiners by adding to the fuel tax. In fact, it might even have taxed fuel containing MTBE differently to cover the cost of cleanup. It elected to place the burden on the owner/operators who had control over the processes that caused problems, *ie.*, those responsible for filling and maintaining the tanks. The logic of the statutory system is apparent. If refiners were to be held liable, owner/operators would have little incentive to properly maintain and fill their tanks. The cost of any negligence would be passed on to the refiners who had no control over the operation of hundreds of thousands of service stations and convenience stores. That cost would undoubtedly be passed on to consumers. The system is designed to encourage those who can prevent the leaks and spills to do so. It places direct responsibility on owner/operators. They are in the best position to remediate their property. By its assessment against tank owners, the regulations attempt to spread the cost of unfunded cleanup among all tank owners. Some of those costs undoubtedly get passed on to consumers in the form of higher gas prices. By implementing a future ban on the use of MTBE, the General Assembly chose a means other than extending liability for leaks to refiners to address the problem. It has not changed the existing statutory scheme, which places liability for leaks on tank owner/operators; nor has DENR changed its water quality standards.

{70}    The statutory system is also in accord with the liability decisions of our appellate courts. That is not surprising since both systems place liability on those with the most control over the problem of leaks and spills—tank owners. There are no North Carolina cases that have imposed liability on a manufacturer of a "defective product" arising out of a spill or release of the product by someone other than the manufacturer. Plaintiffs' theory is novel and contrary to accepted definitions of proximate cause. North Carolina courts have defined proximate cause as:

> that cause, unbroken by any new or independent cause, which produces the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence would have foreseen that such a result was probable under all of the facts then existing. Foreseeability is thus a requisite of proximate cause, which is, in turn, a requisite for actionable negligence.

*Clodfelter v. Leonard*, No. 05-890 (N.C. App. June 20, 2006) (quoting *Williams v. Smith*, 68 N.C. App. 71, 73, 314 S.E.2d 279, 280, cert. denied, 311 N.C. 769, 321 S.E.2d 158 (1984)).

{71}    Plaintiffs seek to avoid the fundamental requirement of proximate causation by urging the court to adopt a theory of causation based upon a remarkably loose definition of forseeability. Under this theory, all refiners of gasoline would be liable for ground and ground water contamination because they have sold a product that contaminates when leaked or spilled with knowledge that some USTs are improperly maintained by service station operators and that some operators would be careless and spill the gasoline. It is undeniable that old and leaking USTs pose a problem in this country and that gasoline will be carelessly spilled at times. However, Plaintiffs' theory would open a Pandora's box of litigation over the negligence of others based on a mere scintilla of forseeability. Clearly, tank owner/operator negligence is a foreseeable possibility, but that fact alone doesn't mean that a refiner of ordinary prudence could foresee

that a given owner/operator's negligence is *probable*. A panel of the North Carolina Court of Appeals recently reiterated the language of the North Carolina Supreme Court's 1972 decision in *McNair v. Boyette*, which stated:

> In searching for the proximate cause of an event, the question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Do the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new independent cause intervening between the wrong and the injury?

*Id.* (quoting *McNair v. Boyette*, 282 N.C. 230, 192, 237-38 S.E.2d 457, 461-62 (1972)). Plaintiffs have failed to satisfy this test. The intervening negligence of the tank owner/operators served as a new independent cause intervening which broke the sequence of event between the alleged wrong and the injury alleged here. To hold refiners liable it must be found not only that the tank owner/operator's intervening negligence was foreseeable but also that it was reasonably foreseeable that the tank owner/operators would fail to fulfill their statutory duty to remediate after a release. A rule based upon Plaintiffs' theory would put the providers of necessary but potentially harmful products at risks that could make the products unaffordable. The North Carolina statutory scheme for cleanup recognizes that reality. Tank owner/operator failure to remediate as required by statute is not foreseeable. The General Assembly has elected a means to deal with the intervening negligence of UST owner/operators that does not impose liability on the manufacturers of the products that are contained in the tanks for the negligent release of those products or the subsequent failure to remediate.

## B.

{72}     In essence, Plaintiffs ask the Court to adopt strict liability in tort for a certain product; in this case not gasoline generally, but only gasoline containing MTBE. To date, our courts have adopted strict liability only in blasting cases. *See Woodson v. Rowland*, 329 N.C. 330, 350-51, 407 S.E.2d 222, 234 (1991). The reluctance to go further is indicative of the appellate courts' deferral to the legislature in this area of public policy as well as a recognition that legislatures, rather than the courts, are better suited to balance the competing interests and public policy issues surrounding such decisions. The cases to which Plaintiffs cite in support of a finding of liability against refiners are from California and New York—both strict liability jurisdictions. Both of those jurisdictions have taken different legislative approaches from North Carolina. Neither state has a statute of repose, and both recognize strict liability for defective products. It is also difficult to see that our appellate courts would take the extraordinary step of imposing strict liability in a situation where the federal government has promoted and encouraged the use of MTBE for the purpose of achieving cleaner air goals and where the General Assembly, in choosing to ban the use of MTBE, did so only at a future date.

{73}     In summary, Refiner Defendants are entitled to dismissal under Rule 12(b)(6) because the Amended Complaint establishes that those defendants did not proximately cause the injury to Plaintiffs and that there was some intervening negligence which was the proximate cause. North Carolina law does not recognize strict liability for use of MTBE nor does it impose liability on a manufacturer for the negligence of a third-party tank owner. If that change is to occur, it should be done by the appellate courts or the legislature.

## C.

{74}     The Court next addresses Plaintiffs' argument that this is really a products liability case and that

the Refiner Defendants are liable for placing a defective product on the market. Adopting this theory would require the Court to ignore proximate causation altogether. The alleged defect in the product (gasoline) is the inclusion of MTBE as a component. If plaintiffs could overcome the proximate causation barrier, they would have to prove that the use of MTBE as a component in gasoline to meet mandated federal standards was negligent. Refiner Defendants contend that the issue is foreclosed by the Congressional mandate to refiners to use oxygenates to help reduce air pollution. The Court is not prepared to enter summary judgment for Refiner Defendants on that basis. Discovery is not complete on that issue, and the Court does not believe that, short of a Congressional direction requiring use of MTBE as the sole source of oxygenates, there is an absolute defense to the negligence claim. There may well exist issues of best available technology to meet the government mandates, but this record is not developed sufficiently to decide those issues on summary judgment. It is clear that MTBE is more soluble in water and does migrate faster than other contaminants in gasoline. The appellate courts may decide that the Congressional mandates were sufficient to relieve the Refiner Defendants from liability for use of MTBE. Congress itself refused to do so. *See* Energy Policy Act of 2005, Pub. L. No. 109-58 (2005); *see also* 151 Cong. Rec. H5772 (daily ed. July 13, 2005) (debate on the motion offered by Congresswoman Capps to instruct the House managers not to agree to a provision limiting MTBE liability for refiners at the conference meeting on the Energy Policy Act of 2005). The detriments of MTBE, upon which Plaintiffs rely, and the benefits of MTBE and government regulations, upon which the Refiner Defendants rely, are known and not subject to dispute. Ultimately, the Court believes that the appellate courts will defer to the General Assembly or Congress to make the complex balancing decisions that need to be made as public policy in this area. Certainly these cases do not present the clear cut case where MTBE has contaminated wells in the absence of other contaminants. The vast majority of the contamination in this case comes from benzene. The Court denies Plaintiffs' and Defendants' motions for summary judgment to the extent that they are based upon use of MTBE as a component of gasoline.

II.

STATUTES OF LIMITATIONS & REPOSE

{75}    If the product liability statute were to apply and Plaintiffs survive summary judgment on the question of whether the Refiner Defendants were negligent in using MTBE, the Court's work would not be done. The Refiner Defendants assert that the applicable statutes of repose and statutes of limitation serve as a bar to all claims brought against them in this action. They have moved both to dismiss the action and for summary judgment. The Ballard Defendants have also asserted the statutes of limitation and repose in support of their motions with respect to certain of the causes of action asserted against them. The Court notes at the outset that the statue of repose need not be pled as an affirmative defense. As the N.C. Court of Appeals has recently reiterated, the statute of repose is a "condition precedent to a party's right to maintain a lawsuit." *Whittaker v. Todd*, __ N.C. App. __, 625 S.E.2d 860, 862 (2006) (quoting *Tipton & Young Construction Co. v. Blue Ridge Structure Co*., 116 N.C. app. 115, 446 S.E.2d 603 (1994)).

{76}    Plaintiffs assert that even though this is a products liability case, the various statutes of repose and limitation that normally apply in products liability cases are inapplicable because there has been no sale, use, or consumption of the product causing the injury and thus the statutes have never begun to run. Such a position is contrary to both the facts of this case and the rationale behind the statutes of repose and limitation.

{77}    It is undisputed that the Refiner Defendants sold gasoline to the Ballard Site.  Title changed hands, and the Refiner Defendants had no control over the gasoline once it left their facilities.  It is equally clear that the gasoline which is the subject of the claims has been consumed.  It has leaked or spilled and cannot be put back in the tank and sold.  It was not sold to Plaintiffs.

{78}    The Court takes its direction on the application of the statutes of limitation and repose from the Supreme Court's decision in *Wilson v. McLeod Oil Company*.  327 N.C. 491, 398 S.E.2d 586 (1990).  The facts of that case are complex and will not be set out here.  They are stated as clearly as they can be in Justice Frye's opinion.  This Court has gleaned several rules governing ground water contamination from the *Wilson* decision.  First, where a plaintiff landowner adduces proof of an ongoing contamination from a prior gasoline leak or spill there is no statute of limitations bar to instituting suit against the allegedly responsible party for the ongoing contamination based upon trespass or nuisance; the plaintiff may only recover damages, however, for the three years preceding the filing of the complaint where the plaintiff's knowledge of the contamination is more than three years old at the time the complaint is filed.  *Id*. at 511, 398 S.E.2d at 596.  Second, a plaintiff landowner must file suit within three years of learning of the contamination on a claim for negligence, product liability, or strict liability under GS 143-275 *et seq*.  *Id*. at 511-12, 398 S.E.2d at 596.  Third, knowledge exists when well water has been tested and shows contamination.  Knowledge does not exist where well water has been tested and the test results do not reveal contamination.  *Id*. at 512, 398 S.E.2d at 596-97.  Fourth, a plaintiff landowner must file suit within six years of a leak or spill giving rise to new contamination in order to avoid the bar of the six-year statute of repose without regard to when knowledge of the contamination originated.  *Id*. at 511-18, 398 S.E.2d at 596-600.  Fifth, in order to avoid the bar of the six-year statute of repose on a products liability claim against a refiner defendant, a plaintiff landowner must show both a sale of product by the refiner defendant and a leak or spill of that product within the six years preceding the filing of the complaint without regard to when knowledge of the contamination originated.  *Id*.  Sixth, the ten year statute of repose bars any products liability claim for a leak or spill occurring more than ten years prior to the filing of the complaint.  *Id*. at 512-13, 398 S.E.2d at 597.

{79}    The Court will apply those principles to the claims in these actions based upon the Courts' ruling below that a cause of action for contamination does not arise until the ground water contaminants exceed maximum concentration levels under state regulations.  The statute of limitations does not begin to run until the landowner is aware that contaminants are present in excess of those permissible levels.

A.

TEN-YEAR STATUTE OF REPOSE

{80}    Plaintiffs' claims arising out of acts occurring more than ten years prior to the filing of the complaints in this action are barred by the ten-year statute of repose.  Under N.C.G.S. § 1-52(16), a cause of action for personal injury or property damage will not accrue unless certain conditions are met.  Nonetheless, the statute prohibits the plaintiff from bringing a cause of action more than ten years after the last act or omission from which relief is sought.  The provision states:

> Unless otherwise provided by statute, for personal injury or physical damage to claimant's property, the cause of action, except in causes of actions referred to in G.S. 1-15(c), shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs.  ***Provided that no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action.***

*Id.* (emphasis added).

{81}     Therefore, regardless of the date of accrual of injury, no cause of action may be allowed if "filed more than 10 years after the last act or omission of the defendant giving rise to the cause of action." *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 513, 398 S.E.2d 586, 597 (1990).  Statutes of repose "set a fixed limit after the time of the product's manufacture, sale, or delivery beyond which a plaintiff's claim will not be recognized." *Boudreau v. Baughman*, 322 N.C. 331, 340, 368 S.E.2d 849, 856 (1988).

{82}     Plaintiffs' original product liability claims are based on a gasoline release from an UST at the Ballard Site that was discovered on October 30, 1987.  (Compl. ¶ 24.)  After noticing an inventory loss of approximately 1,000 to 1,500 gallons of gasoline at the Ballard Site, an excavation of the surrounding grounds revealed a leaking flange gasket on the submersible pump.  (Compl. ¶ 24.)  It is now clear from the record on summary judgment that the tank which leaked did not contain gasoline with MTBE as a component.  Therefore, there could be no liability on the part of the Refiner Defendants as to that leak.

{83}     Even if there were a question as to the presence of MTBE in the tank which leaked in 1987, Plaintiffs' claims against the Refiner Defendants would be barred by the statute of repose.  Under N.C.G.S. § 1-52(16), "no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action."  In *Wilson*, an oil company that supplied gasoline to two sites was sued for claims involving the release of gasoline from USTs located on the two sites.  The oil company stopped supplying gasoline to the first site on April 5, 1974.  *Wilson*, 327 N.C. at 513, 398 S.E.2d at 597.  The oil company stopped supplying gasoline to the second site in March 1973.  *Id.*  The plaintiffs in *Wilson* filed their complaint in July 1986.  *Id.*  The Supreme Court held, therefore, that the plaintiffs' claims against the oil company were barred by the ten-year statute of repose.  The Supreme Court reasoned that the last act of the oil company "was its last delivery of gasoline" to each site.  *Id.* at 514, 398 S.E.2d at 598.

{84}     Similarly, here the last act or omission giving rise to a cause of action occurred on or before the date of release, October 30, 1987.  The last act by Refiner Defendants was the final delivery of gasoline to the Ballard Site preceding the gasoline release, which must have occurred on or before October 30, 1987.  Plaintiffs filed their action in *Adams* on November 8, 2001 against the Ballard Defendants and July 30, 2004 against the Refiner Defendants, and in *Barnett* on October 10, 2003.  Over 16 years elapsed between the last act which would have given rise to a claim against the Refiner Defendants and the filing of the claim against them based on the 1987 leak.  All of Plaintiffs' original claims are based on effects or liability from the sale and release of gasoline in 1987.  Therefore, all of Plaintiffs' original claims against the Refiner Defendants are barred by the ten-year statute of repose.

{85}     The Ballard Defendants are in a different position than the Refiner Defendants with respect to the ten-year statute of repose.  The statutory scheme places the responsibility on the tank owner to remediate. *See supra* ¶¶ 31-37.  Failure to do so may result in liability arising from the failure to remediate and not the leak itself.  Here, there is evidence which might place the failure to remediate within both the ten-year and six-year statute of repose periods.  DENR assessed penalties against some defendants for failure to remediate as late as 1994, and the tank that leaked and the contaminated soil were not removed until 2004. *See supra* ¶¶ 42-49.  Issues of fact exist which prevent summary judgment for either Plaintiffs or Ballard Tire & Oil on the statutory claims.

{86}     Plaintiffs argue that the Complaint need not plead compliance with the statutes of repose.  (Pl.'s Resp. to Mot. to Dismiss at 45).  However, the Supreme Court has held that "[a] statute of limitation or

repose may be the basis of a 12(b)(6) dismissal if on its face the complaint reveals the claim is barred by the statute." *Cage v. Colonial Bldg. Co., Inc.*, 337 N.C. 682, 683, 448 S.E.2d 115,116 (1994).

{87}     In response to Defendants' argument regarding the application of the ten-year statute of repose, Plaintiff argues only that the ten-year statute of repose should not apply because Defendants also move for dismissal based upon the six-year statute of repose in N.C.G.S. § 1-50(6).  (Pl.'s Resp. to Mot. to Dismiss at 45, n.20.)  Plaintiff cites *Cage* as precedent disallowing Defendants' use of the ten-year statute of repose.  However, in *Cage*, the Supreme Court reversed the Court of Appeals decision which held that the six-year statute of repose in N.C.G.S. § 1-50(5) did not apply.  After holding that the six-year statute of repose did not apply, the Court of Appeals held that the ten-year statute of repose did not bar the plaintiff's claims.  Thus, although the Supreme Court found that the six-year statute of repose applied and barred the plaintiff's claims, the Supreme Court did not hold that a defendant is prohibited from seeking dismissal based upon both the ten-year and six-year statutes of repose.  In fact, in *Boudreau v. Baughman*, 86 N.C. App. 165, 172, 356 S.E.2d 907, 911 (1987), *rev'd on other grounds*, 322 N.C. 331, 368 S.E.2d 849 (1988), the Court of Appeals found that both N.C.G.S. § 1-52(16) and N.C.G.S. § 1-50(6) applied to dismiss the plaintiff's complaint.

{88}     Therefore, all of Plaintiffs' original product liability claims against all defendants arising solely out of the 1987 leak are barred by the ten-year statute of repose set forth in N.C.G.S. § 1-52(16).  The "last act or omission of the defendant giving rise to the cause of action" occurred when the gasoline manufacturers delivered the product to the Ballard Site and the Ballard Defendants committed whatever acts caused the leak, more than 16 years before the filing of this action.  "The public policy of this State is to protect North Carolina manufacturers and designers as well as the North Carolina courts from stale claims based on injuries occurring long after the purchase of the allegedly defective product and long after a defendant participated in its manufacture or design." *Id.*  Further discussion of the policy surrounding the application of the statutes of repose to Plaintiffs' claims are found below in paragraphs 93-94.  The claims against the Ballard Defendants that are dependant upon a failure to remediate are not necessarily barred by the ten-year statute of repose.

B.

SIX-YEAR STATUTE OF REPOSE

{89}     Additionally, Refiner Defendants argue that all of Plaintiffs' claims are barred by the six-year statute of repose.  Under N.C.G.S. § 1-50(6), "[n]o action for the recovery of damages for personal injury, death, or damage to property based upon or arising out of any alleged defect or any failure in relation to a product shall be brought more than six years after the date of initial purchase for use or consumption."

{90}     Plaintiffs' first and second claims allege negligence and a failure to warn under N.C.G.S. Chapter § 99B—North Carolina's product liability statute.  Plaintiffs allege that Refiner Defendants negligently produced, manufactured, and sold gasoline containing MTBE to First Stop and subsequently failed to warn Plaintiffs of the alleged risk of water contamination through a release of gasoline containing MTBE.  As product liability claims, Plaintiff's negligence and failure to warn claims fall under N.C.G.S. § 1-50(6).

{91}     Plaintiffs' remaining claims for gross negligence, unfair and deceptive trade practices, conspiracy, fraud, and public nuisance all derive from the product liability claims and are hence subject to the six-year statute of repose of N.C.G.S. § 1-50(6).  Under North Carolina law, claims based upon or arising out of an alleged defect or product failure will fall under the six-year statute of repose of N.C.G.S. § 1-50(6).  *See Colony Hill Condo. I Ass'n v. Colony Co.*, 70 N.C. App. 390, 396, 320 S.E.2d 273, 277 (1984) (finding

that "[t]he generality of the language in § 1-50(6) indicates that the legislature intended to cover the multiplicity of claims that can arise out of a defective product"); *Vogel v. LVD Corp.*, 132 N.C. App. 797, 802, 514 S.E.2d 113, 116 (1999); *Davidson v. Volkswagenwerk*, 78 N.C. App. 193, 336 S.E.2d 714 (1985). Further, allegations of fraud do not extend the period of repose for products liability cases as they do in real property cases. *Jack H. Winslow Farms, Inc. v. Dedmon*, 171 N.C. App. 754, 615 S.E.2d 41, *pet. disc. rev. denied*, 360 N.C. 64, 621 S.E.2d 625 (2005). Thus, all of Plaintiffs' claims against Refiner Defendants are subject to the six-year statute of repose of N.C.G.S. § 1-50(6).

{92}     Plaintiffs do not dispute that the six-year statute of repose of N.C.G.S. § 1-50(6) applies to all of Plaintiffs' claims. (Pls. Resp. at 46-47.) However, Plaintiffs posit that the statute of repose has not expired. In fact, Plaintiffs argue that the statute of repose has not begun to run because there has been no "initial purchase for use or consumption." (Pls. Resp. at 47-50.) In support of this argument, Plaintiffs cite several cases in which a manufacturer sold a product to a dealer-distributor who later sold said product to a third party. (Pls. Resp. at 47-50.) In earlier cases, the statute of repose for the manufacturer did not begin to run when the product was sold to the dealer-distributor. Instead, the statute of repose began to run when the product was sold to the consumer. *See Teeterton v. Long Mfg. Co., Inc.*, 314 N.C. 44, 332 S.E.2d 67 (1985) (holding that the statute of repose began to run when farmer bought tobacco harvester from dealer-distributor, rather than when dealer-distributor bought from manufacturer); *Chicopee, Inc. v. Sims Metal Works, Inc.*, 98 N.C. App. 423, 391 S.E.2d 211 (1990) (holding that the statute of repose began to run when plaintiff textile manufacturer bought from dealer-distributor, rather than when dealer-distributor bought from manufacturer). Consequently, Plaintiffs contend that the statute of repose of N.C.G.S. § 1-50(6) can never be triggered in this case.

{93}     Plaintiffs' suggested outcome is untenable in light of the policy and rationale behind N.C.G.S. § 1-50(6). The Supreme Court of North Carolina noted that "the obvious intent of the legislature . . . was to limit . . . manufacturers'[] liability after a certain period of years had elapsed from the date of initial purchase for use or consumption." *Tetterton v. Long Mfg. Co.*, 314 N.C. 44, 56, 332 S.E.2d 67, 74 (1985). The Court of Appeals found that N.C.G.S. § 1-50(6) "is intended to be a substantive definition of rights which sets a fixed limit after the time of the product's manufacture beyond which the seller will not be held liable. *Davidson v. Volkswagenwerk,* 78 N.C. App. 193,195, 336 S.E.2d 714, 716 (1985). The Court of Appeals further described the six-year statute of repose by reasoning that "the public policy of this State is to protect North Carolina manufacturers and designers as well as the North Carolina courts from stale claims based on injuries occurring long after the purchase of an allegedly defective product and long after a defendant participated in its manufacture or design." *Boudreau v. Baughman*, 86 N.C. App. 165, 172, 356 S.E.2d 907, 911 (1987), *rev'd in part, modified and aff'd in part*, 322 N.C. 331, 368 S.E.2d 849 (1988). "It is apparent from the face of the statute that the North Carolina legislature intended to establish a fixed cut-off date to bar actions brought after six years alleging an injury caused by a manufactured good." *Lindsay v. Public Serv. Co.*, 725 F. Supp. 278, 282 (W.D.N.C. 1989), *appeal dismissed*, 732 F. Supp. 623 (W.D.N.C. 1990).

{94}     In more recent cases, the Court of Appeals has helped further distinguish when the statute of repose of N.C.G.S. § 1-50(6) begins to run. In *Cacha v. Montaco, Inc.*, 147 N.C. App. 21, 554 S.E.2d 388 (2001), the plaintiff homebuyers' claims against a synthetic stucco (EIFS) manufacturer were barred by the six-year statute of repose. The plaintiff homebuyers argued that the statute of repose should begin to run at the time of the purchase of the house. In rejecting the plaintiffs' argument, the Court of Appeals

held that the statute of repose began to run when the EIFS was purchased by the subcontractor. The Court of Appeals reasoned that the EIFS was first purchased for use or consumption by the subcontractor who applied the product. Moreover, the Court of Appeals reasoned that once the subcontractor "applied the EIFS, it was 'consumed,' that is, utilized in the construction process, which use resulted in its transformation, and the destruction of its original form. At that point, the EIFS could not be returned to its original consistency and could not be deployed in the construction of another house." *Id.* at 26, 554 S.E.2d at 392 (citations omitted).[11]

{95} Plaintiffs contend that *Cacha* should be applied to the present case such that the "initial purchase for use or consumption" would be "when a consumer at a retail outlet purchases gasoline." (Pl.'s Resp. Mot. Dismiss at 49.) Plaintiffs assert that because there was never a purchase of the gasoline by a consumer at a retail outlet, the statute of repose has not begun to run. (Pl.'s Resp. Mot. Dismiss at 50.)

{96} Plaintiffs' interpretation of *Cacha* does not rationally relate to the present facts. The released gasoline could never have been purchased at a retail outlet. The reasoning of the Court of Appeals in *Cacha* supports finding that the six-year statute bars Plaintiffs' claims. The *Cacha* Court found that the transformation or destruction of the product's original form constituted the moment in time in which the product was consumed for purposes of N.C.G.S. § 1-50(6). 147 N.C. App. at 26, 554 S.E.2d at 392. Here, the release of the gasoline caused the transformation or destruction of the gasoline's original form. After the release, the gasoline could no longer be sold in the form in which it was delivered by the Refiner Defendants to the Ballard Site. Therefore, applying the reasoning in *Cacha*, the last act or omission on which a cause of action could be based must be the release of gasoline from the Ballard Site. Thus, the six-year statute of repose bars Plaintiff's original claims against the Refiner Defendants, which were brought more than 16 years after the release of gasoline in 1987.

*Estoppel.*

{97} Plaintiffs claim that Defendants should be barred from asserting the statute of repose under the doctrine of equitable estoppel because of Defendants' alleged fraudulent behavior and concealment with respect to the dangers and hazards of MTBE. (Pl.'s Resp. Mot. Dismiss at 50-51.) In order to bar the assertion of the statute of repose to dismiss a claim, the complaint must sufficiently allege a claim for equitable estoppel on its face. *Cacha*, 147 N.C. App. at 28, 554 S.E.2d at 393. To sufficiently allege a claim for equitable estoppel, a plaintiff must claim elements of "conduct amounting to a false representation or concealment of material facts." *Bryant v. Adams*, 116 N.C. App. 448, 460, 448 S.E.2d 832, 838 (1994). In *Bryant*, the Court of Appeals found that the plaintiff's complaint contained the essential elements of a claim for equitable estoppel where the defendant's discovery abuses delayed the filing of a claim thereby subjecting the claim to dismissal by the statute of limitations or repose. *Id.* at 460, 448 S.E.2d at 838. In the present case, the statute of repose began when the gasoline was released. There is no allegation in the Complaint that Defendants concealed any material facts regarding the release of the gasoline. Therefore, the doctrine of equitable estoppel does not prevent the statute of repose from barring Plaintiff's claims.

*Latent Diseases Exception*

{98} Plaintiffs further argue that their claims are shielded from the six-year statute of repose by the latent diseases exception. *See Wilder v. Amatex Corp.*, 314 N.C. 550, 336 S.E.2d 66 (1985). In *Wilder*, the Court held that the applicable statute of repose did not bar the plaintiff's wrongful death claim for

asbestosis, even though more than 10 years had passed from plaintiff's last exposure to the defendant manufacturer's asbestos products. *Id.* at 551-52, 336 S.E.2d at 72-73. Here, Plaintiffs have failed to sufficiently plead specific claims of actual latent diseases. Thus, the exception to the application of the six-year statute of repose for latent diseases does not apply in this case.

*Minority Exception*

{99} Plaintiffs argue that those plaintiffs who were minors at the alleged time of injury should have their claims tolled for statute of repose purposes until they reach majority or a guardian *a d litem* is appointed under N.C.G.S. § 1-17. (Pl.'s Resp. Mot. Dismiss at 51, n. 24) However, the Court of Appeals in *Bryant* clarified the effect of the statute:

> Moreover, G.S. § 1-17 does not completely eviscerate the statute of repose in the case of minors and others under disability. If a product is over six years old at the time of injury, which would be the time that the claim accrues, then the statute of repose operates as a total bar on that claim. However, if a claim accrues before the six year statute of repose has expired, G.S. § 1-17 simply operates to extend the time period within which a minor or other with disability may bring suit under Chapter 99B. Therefore, claims **accruing** after six years will still be barred.

116 N.C. App. at 458, 448 S.E.2d at 837. Thus, the six-year statute of repose bars the claims of all minor plaintiffs unless they are claiming that they were injured within six years of the release alleged to have caused their injury. Any claims arising out of the 1987 leak would be barred..

## C.
### APPLICATION OF THE STATUTES OF REPOSE

{100} The application of the statutes of repose raise the most contentious issue in this case: Have Plaintiffs adequately pled or established factual proof of a leak or spill of MTBE containing gasoline from the Ballard Site within the six- or ten-year period before a statutory bar? When these cases were first filed Plaintiffs alleged that their injuries resulted from tank leaks at the Ballard Site in 1987 and the Fisher Site in 1997. It is well established that a large leak occurred at the Ballard Site in 1987. It is now clear that the leak did not involve gasoline containing MTBE. Accordingly, there can be no claim against the Refiner Defendants arising out of the 1987 leak at the Ballard Site. It is incumbent upon Plaintiffs to establish that there was a sale by Refiner Defendants of MTBE gasoline which leaked from the Ballard Site less than six years prior to the filing of the complaint against them in 2003. Thus, 1997 becomes the critical year.

{101} The Refiner Defendants sold gasoline products containing MTBE to the Ballard Site up until sometime in 2002. MTBE is present in some wells in the Broad Creek Community. The missing element of clear allegation and proof is the occurrence of a leak or release from the Ballard Site that caused the contamination in the wells during the applicable period.

{102} Plaintiffs' problems in that regard arise from the failure of their designated expert to render a valid opinion that such a leak occurred in 1997 or later. The designated expert, Mr. Brown, originally expressed such an opinion. However, on cross examination during his deposition he disavowed that opinion stating that he could no longer give that opinion based upon the results of certain studies that had been brought to his attention after his original opinion was formed.[12] Nor is there an allegation in the Amended

Complaint of a specific incident post-1996 giving rise to a leak or spill.[13]   Similarly, there is no factual evidence in the record of a specific leak or spill at the Ballard Site after 1996.  There is no evidence of when, where, or how a leak or spill occurred after 1996.

{103}     Having lost their expert, Plaintiffs fall back upon three different approaches to establish the required leak within the safe harbor.  First, they seek to use expert opinions from other reports which were not designated as expert opinions as required by the Case Management Order.  Those expert opinions include reports by DENR and consulting company Groundwater Management Associates (GMA), along with affidavits filed by Rick Shiver and Steven Campbell.  Defendants have objected to the Court's consideration of those expert opinions and affidavits.  Their objections are well founded and their motion to strike the other expert reports is granted to the extent those reports contain opinions which were not disclosed as required by the Case Management Order. Defendants had no opportunity to challenge or test those reports.  As proven by the deposition of Mr. Brown, such opportunities are critical to the process.  This ruling is in line with a recent Court of Appeals opinion which affirmed Judge Spainhour's decision to exclude evidence which was produced in a manner that was in violation of the court's rules and orders governing discovery in that case.  *In re Pedestrian Walkway Failure*, __ N.C. App. __, 618 S.E.2d 796 (2005).  There, the Court of Appeals noted:

> . . . the record is replete with information which reveals the importance of the deadlines in each of the pedestrian walkway cases and with admonitions by Judge Spainhour that the parties should strictly and completely comply with rules and orders governing discovery. On the facts of this case, we are unpersuaded that Judge Spainhour was compelled to find that there was good cause to permit Dr. Bederka to testify, and we discern no abuse of discretion in the decision to exclude Dr. Bederka's testimony.

*Id.*, __ N.C. App. at __, 618 S.E.2d at 804.

{104}   The Court also notes that DENR originally asserted that the 1987 leak was the source of MTBE contamination, while it is now conceded that no MTBE-containing gasoline was involved in that leak.  To the extent the reports contain factual information as opposed to conclusions they will be considered by the Court.  None of the reports relied upon contain factual accounts of any spill or leak after 1996.  At best, they contain the bare expert conclusion that the contamination in the Broad Creek Community must have come from the Ballard Site without any specificity as to when and how the contamination occurred.

{105}   Second, Plaintiffs assert that the Ballard Defendants are guilty of spoliation.[14]   The Court notes at the outset that the spoliation claim is only asserted as to the Ballard Defendants and has no effect with respect to the Refiner Defendants' motions.  Plaintiffs conceded that point at oral argument.  It is undisputed that sometime during 2004, after these lawsuits had been filed, some of the Ballard Defendants caused the tank that was alleged to be the source of the 1987 leak to be removed and also removed a substantial amount of contaminated soil from the area around the tank.  Plaintiffs were not notified that the tank would be removed or the contaminated soil disposed of.  The Ballards did comply with state law by notifying DENR of its proposed remedial action.  Representatives from DENR were present when the tank was removed and inspected it.  The Ballards also had their own expert present for the removal.

Remediation of the site was one of the remedies sought by Plaintiffs in their claims against the Ballards. The Ballards complied with state law and procedures in the removal process and were entitled to remediate the site. The sole question is whether they were required to notify Plaintiffs of the remediation.

{106}    No specific discovery requests were pending.  No orders were in place restricting the Ballards from cleaning up the site.  The tank and the contaminated soil, however, could have provided evidence relevant to what had happened at the site.  In fact, defendants had their expert there, and he has provided opinions based upon what he saw.  While representatives from DENR were present, it appears that their participation in and recordation of the tank and soil removal was woefully inadequate.[15]  The Court does note that numerous monitoring wells had been placed on the Ballard Site after 1987 and that Plaintiffs have had access to those records.   Nonetheless, the Court is troubled by the removal and destruction of the tank and soil without giving Plaintiffs' counsel the opportunity to inspect them before destruction.  The Court is unaware of any similar circumstance in the reported cases, and the government regulations all address notice to the government.  Private plaintiffs should not have to rely on the government to do the inspection as this case so amply demonstrates.  On the other hand, the Court is also troubled by the fact that although Plaintiffs' counsel knew within days of the removal of the tank and soil in 2004, no issue was raised with the Court until the response to the motion for summary judgment in 2005 when spoliation was asserted to defeat the summary judgment motion—this after Plaintiffs' expert had failed to pinpoint a leak within the statute of repose period.  The Court has concluded that, for purposes of this motion and trial, the Court will give the standard spoliation charge and will let the jury consider the fact that the tanks and soil were removed without giving Plaintiffs an opportunity to inspect them.  This is but one of the issues in this case with which the appellate courts may wrestle and come to a different conclusion.  It is arguable that by complying with state law the Ballard Defendants fulfilled any duty to Plaintiffs and thus no spoliation occurred.

{107}    Finally, Plaintiffs rely on circumstantial evidence to prove that there was a leak from the Ballard Site within the statutes of limitation and repose which impacted their wells.  Since the Court has ruled that the cause of action does not accrue until the damage is done by contaminating the well above state regulated levels, the issue of when the leak occurred as to the Ballards is not as significant as it is with respect to the Refiner Defendants.  There need only be some evidence of a leak from the Ballard Site which could have reached the Plaintiffs in order to defeat summary judgment on some of the claims against the Ballard Defendants.   There is sufficient circumstantial evidence in this record to do so. Plaintiffs have raised questions concerning the Ballards' maintenance of the tanks, the large amount of soil contamination, the lack of other potential sources of contamination, their delay in remediation, and their action in removing the tank and soil, the sum of which are sufficient to raise an issue of fact with respect to the source of contamination in Broad Creek.  *See Wilson*, 327 N.C. at 520, 398 S.E.2d at 602; *James v.*

*Clark*, 119 N.C. App. 178, 454 S.E.2d 826 (1995).

{108}   The disparity between proof required to keep the Refiner Defendants in the case and that which keeps the Ballard Defendants in the case seems at first appearance to be inconsistent. In a way it is. The difference arises as a result of the nature of the claims asserted. If the only means of getting around the causation problem for Plaintiffs is invoking the product liability statute, then the statutes of limitation and repose become significant and impose on Plaintiffs the obligation to fit sale of the allegedly defective product within the timeframe not barred by the statutes. The statutes of repose clearly create a situation in which a cause of action can be barred before the injury occurs or becomes known. That is what happens in this instance. If the 1987 leak had contained MTBE that did not show up in wells until 2000, the statute of repose would still bar the product liability claims against the Refiner Defendants. Because the different causes of action asserted against the Ballard Defendants that are not based on products liability do not carry the bar created by the statute of repose, Plaintiffs do not have the same proof and pleading requirements to sustain those causes of action. In summary, there is evidence that the Ballard Site was the source of some contamination of some wells in the Broad Creek Community, but there is no specific evidence of a leak containing MTBE within the statutes of limitation and repose. If a cause of action for negligent design against the Refiner Defendants does not accrue until contamination above permitted levels, the statute of repose would be rendered meaningless. Since there are claims against the Ballard Defendants based on causes of action other than products liability, Plaintiffs do not have to meet the same requirements for specific evidence of the timing of a release.

III.
NEGLIGENT CONTAMINATION:
STANDARD FOR LIABILITY

{109}   Also at issue is which state drinking water standards determine the standard for liability in negligent contamination cases. As discussed above, the North Carolina Administrative Code sets groundwater standards which represent the "maximum allowable . . . concentrations [of contaminants] which may be tolerated without causing a threat to human health or which would otherwise render the groundwater unsuitable for its intended best usage." 15A NCAC 02L .0202 (2006). The Eastern District of North Carolina, applying North Carolina law, looked at the issue of whether it was necessary for a plaintiff to demonstrate that contamination levels exceeded state water quality standards to make a prima facie claim for negligent contamination. It determined that a plaintiff must establish contamination in violation of North Carolina groundwater quality standards to survive a motion for summary judgment. *Brooks v. E.I. Du Pont De Nemours & Co., Inc*., 944 F. Supp. 448, 449 (E.D.N.C. 1996). The court explained that "[t]he General Assembly has apparently determined that levels of contaminants which fall below the maximum allowable concentration do not pose a threat; rather, such levels pose an acceptable risk." *Id*. It therefore held that the maximum allowable concentration levels set by the General Assembly established the standard for liability in water contamination cases.

{110}   Additionally, this Court finds it significant that the statutory scheme requires remediation to achieve the minimum standards. *See supra* ¶ 38. By definition, concentration levels that do not reach the standard set by North Carolina regulations do not create a threat to human health or render the groundwater "unsuitable for its intended usage." Therefore, unless each Plaintiff can establish the existence of concentrations of MTBE or other contaminants sufficient to violate the state groundwater

quality standards, they do not have standing to pursue their claims at trial and their claims must be dismissed.

{111}   The maximum allowable concentration of MTBE in North Carolina groundwaters is 200 ppb. 15A NCAC 02L .0202(g). With three exceptions Plaintiffs' have failed to demonstrate concentrations of MTBE in excess of that standard.

{112}   Plaintiffs argue that the applicable threshold for contamination is the taste and odor threshold and that it is irrelevant that the threshold for a specific chemical listed in the regulations is not met. The Court has a number of problems with that approach. First, with respect to the particular chemicals at issue here, the state regulations have made a specific determination of the level of concentration that would render the water unhealthy for use. In the case of benzene, that is an especially low threshold, and one that is exceeded by most of the wells in Broad Creek. The statute would make little sense if the taste and odor threshold were to override the specific maximum allowable concentration levels. If that were the case with specific chemicals, the state would set the level that created contamination at the taste and odor level where that level was less than the specific level designated.

{113}   In the case of MTBE, for example, that level would be set at 1.2 ppb according to Plaintiffs' theory, because it is at that level that taste and odor are affected. There are many chemicals that are not specified in the regulations that could affect taste and odor. The state has elected to set specific limits for certain chemicals, and the taste and odor threshold is a catch-all to cover any chemicals that are not specified. Under the canon *lex specialis derogat legi generali*, when interpreting statutes or regulations it is a general rule that where there are specific and general terms, the specific overrules the general. *Piedmont Publ'g Co. v. City of Winston-Salem*, 334 N.C. 595, 598, 434 S.E.2d 176, 177-178 (1993). Applying the principle here requires using the specific levels for MTBE and benzene.

{114}   Second, the specific maximum allowable concentration levels for MTBE and benzene form a bright line, objective, and easily determinable test. Taste and odor are fuzzy and subjective tests, not readily reducible to a clear determination. Third, if taste and odor had been an acceptable test, the Supreme Court would have adopted it in *Wilson v. McCleod Oil*. Justice Frye clearly opted for the specific maximum allowable concentration levels in applying the statute of limitations, holding that even in the face of taste and odor problems, the statute did not begin to run until the testing showed a violation of state regulations. *Wilson*, 327 N.C. at 512, 398 S.E.2d at 596-97. The Court believes *Wilson* to be controlling law on this issue.

{115}   State authorities responsible for protecting the state's water sources are in a better position than courts to set and reset standards based on new scientific information and changing standards of health. They have the expertise, and their guidelines present bright-line objective determinants where specific chemicals are involved rather than subjective and ambiguous tests such as taste and odor.

{116}   The use of taste and odor as a threshold might be appropriate in some other situations. The claims here are based on specific chemicals being contained in the water, and the *Wilson* decision makes it clear that the statute of limitations does not begin to run until there exists a test showing contamination above the maximum allowable concentration levels permitted by state regulation for those specific chemicals. If taste and odor had been selected by the Supreme Court in *Wilson* the claims would have been barred. The Supreme Court relied instead upon the validity of the state regulations. This Court should do the same.

{117}   It is clear from Appendix A that only three wells—WCW-6, -8 & -11—exceeded the maximum allowable concentration levels of MTBE, so only Plaintiffs using those three wells would have a claim

based upon MTBE contamination.  Therefore, only those families would have a claim against the Refiner Defendants if such claims were not otherwise barred.  The families who have used those wells include: the Morton (Virginia) family, the Lewis family, the Beall family, the Defeo family, and Emma P. O'Neal. *See supra* n. 10.

{118}　Almost all of Plaintiffs' wells had benzene contamination above permitted levels.  Therefore, claims exist for negligent contamination of those wells, but Refiner Defendants are not liable for those claims.  Issues of fact remain to be decided as to whether any of the Ballard Defendants would be liable for that contamination.  Only those plaintiffs whose wells are in the Central District may proceed with their claims against the Ballard Defendants.

{119}　As a corollary, when a well owner ceases to use her well as a result of perceived contamination from a particular source, the statute of limitations should begin to run at that point.  The Beall family connected to the public water supply on October 2, 2000, a year before tests indicated contamination levels in excess of state standards.  (Aff. of Elizabeth Beall.)  The Morton family connected to the public water supply on November 3, 2000, a year before tests discovered contamination levels in excess of state standards.  (Aff. of Virginia Morton.)  Questions of fact remain as to whether the Beall and Morton families were damaged by contamination proximately caused by a release of gasoline from the Ballard Site.  The Lewis family connected to the public water supply in January, 1992—eight years before tests indicated contamination levels in excess of state standards.  (Aff. of Margaret Lewis.)  The family maintains that it continued using the well water for purposes other than for drinking until it learned of the contamination.  *Id.*  A question of fact remains as to whether that continued use was sufficient to give rise to a claim for damages.  The Defeo family moved away from the Broad Creek Community several years before contamination was discovered.  (Aff. of Jennifer Defeo.)  The Defeo family thus has no standing to bring suit and therefore their claims for MTBE contamination should be dismissed along with all other Plaintiffs who were not connected to Water Supply Wells 6, 8, or 11.

IV.

CLAIMS REMAINING AGAINST

INDIVIDUAL BALLARD DEFENDANTS

{120}　As noted above, A.J. Ballard, Jr. and Joyce Ballard conveyed ownership of the property at the Ballard Site to Gary Allen Ballard and Joyce Ballard, in her capacity as Trustee for Albert Christopher Ballard, in 1984.  *See supra* ¶ 59.  There is no evidence Joyce Ballard has had any dealings with the property in her individual capacity since that time.  Therefore, no claims remain against her.  Throughout the relevant time-period, the property has been leased to Ballard Tire & Oil Co.  There is not sufficient evidence to indicate that Defendants Gary Allen Ballard, Albert Christopher Ballard, or Joyce Ballard in her capacity as Trustee, exercised sufficient control over the property for claims against them to remain.  There is at least some evidence A.J. Ballard, Jr. continued to exercise some control over the property.  Therefore claims remain against A.J. Ballard, Jr. and Ballard Tire & Oil for those plaintiffs whose wells were contaminated above the maximum allowable concentration levels as discussed above.  *See supra* ¶¶ 109-119.

V.

OTHER REMAINING CLAIMS

{121}     Finally, the Court must determine whether Defendants are entitled to summary judgment as a matter of law with respect to Plaintiffs' *res ipsa*, fraud, nuisance and trespass, willful and wanton negligence, and OPHSCA claims.

*Res ipsa loquitor*

{122}     Plaintiffs have asserted a claim against the Ballard Defendants under the doctrine of *res ipsa loquitor*. The doctrine of *res ipsa loquitor* "permits negligence to be inferred from the physical cause of an accident, without the aid of circumstances pointing to the responsible human cause" *Harris v. Tri-Arc Food Systems, Inc.*, 165 N.C. App. 495, 501, 598 S.E.2d 644, 648 (2004) (quoting *Williams v. 100 Block Assoc.*, 132 N.C. App. 655, 663, 513 S.E.2d 582, 587 (1999)). A plaintiff invoking *res ipsa loquitor* must show: "(1) that there was an injury, (2) that the occurrence causing the injury is one which ordinarily doesn't happen without negligence on someone's part, (3) that the instrumentality which caused the injury was under the exclusive control and management of the defendant." *Id.* (quoting *Williams*, 132 N.C. App. at 663-64, 513 S.E.2d at 587. The doctrine is inapplicable in cases where the facts do not point to the defendant as the *only* probable tortfeasor. *Williams*, 132 N.C. App. at 664, 513 S.E.2d at 587). "In such a case, unless additional evidence, which eliminates negligence on the part of all others who have had control of the instrument causing the plaintiff's injury is introduced, the court must nonsuit the case." *Id.* Furthermore, *res ipsa loquitor* is available only in cases where there is no available evidence to prove the cause of the injury. *Id.*

{123}   Plaintiffs have failed to provide evidence that would show that the Ballard Defendants are the only possible tortfeasors. Also, Plaintiffs have presented evidence of the cause of their injury. For both of these reasons, the doctrine of *res ipsa loquitor* is unavailable to the Plaintiffs in this case.

*Fraud*

{124}     Plaintiffs base their fraud claim against the Refiner Defendants on alleged misstatements and omissions that the Refiner Defendants made while lobbying the government for approval of MTBE as an additive to gasoline. These statements are constitutionally protected "petitioning activity" shielded from civil liability by the First Amendment right to petition to government and the so-called *Noerr-Pennington* immunity doctrine. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *Eastern R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *see also Hamilton v. Accu-Tek*, 935 F. Supp. 1307, 1321, 1324-25 (E.D.N.Y. 1996) (applying the *Noerr-Pennington* doctrine in the negligence and product liability context), *vacated & remanded on other grounds sub nom. Hamilton v. Beretta U.S.A., Inc.*, 264 F.3d 21 (2d Cir. 2001).

{125}   Under the doctrine, actions against businesses or individuals are prohibited where the activity that is being challenged involves lobbying, "despite the defendant's anticompetitive or otherwise injurious purpose or effect." *Hamilton*, 935 F. Supp. at 1316. The doctrine was developed to protect the First Amendment right "to petition the Government for redress of grievances." U.S. Const. Amend. I; *see Noerr*, 365 U.S. at 132-33. Two exceptions have been adopted to limit the doctrine in certain circumstances: (1) where the efforts to influence the government are merely a "sham" to disguise an attempt to directly injure another and (2) where the challenged political activity involved illegal or corrupt means. *See Noerr*, 365 U.S. at 144; *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 262-63 (D.C. Cir. 1981). Neither of those exceptions applies here. Applying the *Noerr-Pennington* doctrine to the facts here, the Court concludes that fraud claim against the Refiner Defendants should be dismissed.

*Nuisance & Trespass*

{126}   Plaintiffs have also brought claims for nuisance and trespass.  The nuisance and trespass claims as to Defendants Ballard Tire & Oil and the estate of A.J. Ballard Jr. survive summary judgment, but only those plaintiffs whose wells are in the Central District may proceed with their claims.  Nuisance and trespass claims against all other defendants are dismissed.  As discussed above, in accordance with *Wilson*, Plaintiffs may only recover for damages caused by any recurring trespass or an additional spill or release at the Ballard Site within three years of the filing of the complaint.  *See supra* ¶ 78.  That is because Plaintiffs had notice of the 1987 leak from DENR more than three years before filing their complaint.

*Willful & Wanton Negligence*

{127}    Plaintiffs have also filed a claim for willful and wanton negligence against the Ballard Defendants.  Those claims survive only to the extent they are based on the Ballard Defendants' failure to remediate and only as to Defendant Ballard Tire & Oil and the estate of A.J. Ballard.  In all other aspects, Plaintiffs' willful and wanton negligence claims are dismissed.

*OPHSCA*

{128}    Plaintiffs claim that the Ballard Defendants are strictly liable under the Oil Pollution and Hazardous Substances Control Act, N.C.G.S. § 143-215.93, *et seq*. ("OPHSCA").  The OPHSCA holds strictly liable "any person having control over oil or hazardous substances" for "damages from oil and hazardous substances that enter the waters of the State."  N.C.G.S. § 143-215.93.  The OPHSCA claims as to Defendants Ballard Tire & Oil and the estate of A.J. Ballard Jr. survive summary judgment, but only those plaintiffs whose wells are in the Central District may proceed with their claims.  All other claims under the OPHSCA are dismissed.

CONCLUSION

{129}   In summary, the Court has concluded that the Refiner Defendants are entitled to dismissal of the claims against them on the grounds that: (1) refiners are not responsible for the intervening negligence of tank owners/operators; (2) the statutes of repose and limitation bar any claims arising out of the 1987 leak at the Ballard Site; (3) the 1987 leak at the Ballard Site did not involve gasoline with MTBE as a component; and (4) there is no proof as to the Refiner Defendants that there was a leak at the Ballard Site after 1996 that resulted in MTBE contamination of a plaintiff's well from a refiner's product. In addition, there were only three wells which showed levels of contamination by MTBE in excess of permitted levels. Plaintiffs whose wells tested below 200 ppm of MTBE do not have a claim for contamination against the Refiner Defendants.

{130}   With respect to the Ballard Defendants, the Court has concluded that there are genuine issues of material fact which preclude summary judgment for Ballard Tire & Oil and the estate of A.J. Ballard on the First, Third, Fourth, Fifth, Seventh, Eighth and Tenth Causes of Action in the Second Amended Complaint.  The Fourth Cause of Action is limited to willful and wanton negligence arising out of the alleged failure to remediate, and any claim for punitive damages would be limited to that claim.  The Seventh and Eighth Causes of Action remain based upon the existence of either sufficient evidence to show a renewing trespass and nuisance or a leak or spill at the Ballard Site within three years preceding the filing of the Complaint.  The Second, Sixth and Ninth Causes of Action are dismissed.  The remaining claims survive based on existing material issues of fact to be determined with respect to whether (1) there was a leak or spill at the Ballard Site after 1996 that caused contamination of some plaintiffs' wells and (2) whether or not there was a failure to remediate the 1987 spill that extended beyond three years prior to

the filing of the Complaint. Plaintiffs will be required to prove that there was some incident at the Ballard Site other than the 1987 leak which contaminated their wells or that a failure to remediate the 1987 leak extending into the limitations period caused the contamination of their wells.

{131} The Court has concluded that liability for well water contamination caused by chemicals specifically addressed in state regulations is dependent upon the existence of levels of contamination in excess of maximum allowable concentration levels for those chemicals under the regulations.

{132} The Court has concluded that for all claims other than renewing trespass and nuisance, which may be ongoing, the statute of limitations begins to run when there is actual notice, for example from the published notice by DENR, or an actual test showing contamination at levels above those permitted by the state. In any event, where there has been notice, Plaintiffs' damage claims are limited to the three years prior to the filing of the complaint.

{133} There is no strict liability under North Carolina law for using MTBE as a component in gasoline.

{134} The critical issue thus becomes whether there was a leak or spill at the Ballard Site from 1997 forward which impacted a plaintiff's well water. Nowhere in the record is there a definitive unconditional expert opinion that a leak or spill occurred at the Ballard Site at any time from 1996 forward. Nor is there any direct evidence that a leak or spill occurred. There is not even a specific allegation that some incident occurred at some point in time from 1996 forward that caused a problem. There are no reports to DENR of a leak or spill. The monitoring wells in place did not indicate additional or new contamination. It is clear that the 1987 spill could not have caused MTBE contamination.

{135} Plaintiffs rely on the fact that there is benzene and other contamination in their wells and that there is no other explanation or source for the contamination other than a problem at the Ballard Site. They rely on the fact that contaminated soil was present when the UST was removed from the Ballard Site in 2004. They also rely on evidence that Ballard Tire & Oil and A. J. Ballard, Jr. were not prompt or diligent in remediating problems at the site. There is evidence of technical violations of state regulations at the site. Whether or not there were other potential sources for the contamination is disputed. If the Court's ruling on spoliation is upheld on appeal, Plaintiffs will be entitled to a favorable charge on that basis. Expert discovery is closed. Plaintiffs' expert did not provide an opinion with respect to leaks after 1997 which would get Plaintiffs to a jury. He retracted his earlier opinion, which he properly should have done if it was incorrect or unsupportable based on the facts. Plaintiffs must convince a jury based upon the factual evidence in the record that it is more likely than not that a leak occurred at the Ballard Site from 1997 forward that contaminated some of the wells in the Broad Creek Community and, specifically, their own wells.

{136} Based upon the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED, that:

    1)    Plaintiffs' claims against the Refiner Defendants are dismissed with prejudice.

    2)    Plaintiffs' claims against Joyce Ballard, individually and as Trustee, Albert Christopher Ballard, and Gary Allen Ballard are dismissed with prejudice.

    3)    The Second, Sixth, and Ninth Causes of Action are dismissed with prejudice.

    4)    The Fourth and Tenth Causes of Action are dismissed except as to the claims arising out of failure to remediate.

    5)    Plaintiffs' Motion for Summary Judgment is DENIED.

    6)    Defendants' Motion to Exclude Expert Opinions not tendered in a timely manner as

7)      The claims of those plaintiffs using wells in the Eastern and Western Districts are dismissed.


This, the 30th day of June, 2006.


LINKS:

- Appendix A
- Appendix B

[1]     The reliability of testing presents another issue.  However, as the Supreme Court pointed out in *Wilson*, the statute should not run until there is an accurate test showing contamination.  *Wilson v. McLeod Oil Company*, 327 N.C. 491, 398 S.E.2d 586 (1990).

[2]     Appendix A compiles the information included in Plaintiffs' affidavits filed on April 20 and May 5, 2006 pursuant to the Court's Order of March 7, 2006.  The division of the wells into three geographical groups (East, Central, and West) is consistent with the divisions crafted by experts for both Plaintiffs and Defendants.

[3]     The Refiner Defendants cite to the federal requirements as a complete defense to their use of MTBE.

[4]     The legislation states:

> No person shall knowingly add MTBE to any motor fuel manufactured, distributed, stored, sold, or offered for sale in this State. No person shall manufacture, distribute, store, sell, or offer for sale motor fuel that contains a concentration of MTBE of more than one-half of one percent (0.5%) by volume in this State. The presence of MTBE in a motor fuel caused solely by incidental commingling of the motor fuel with other motor fuel that contains MTBE during transfer or storage of the motor fuel does not constitute a violation of this section.

2005 N.C. Sess. Laws 93.  That aspect of the legislation becomes effective on January 1, 2008.

[5]     The regulations define 'free product' as "a regulated substance that is present as a non-aqueous phase liquid (e.g., liquid not dissolved in water)."  15A NCAC 2N .0203 (adopting 40 CFR § 280.12 by reference).

[6]     North Carolina has established two trust funds—one for commercial tanks and one for non-commercial tanks—to provide reimbursement for costs incurred in the cleanup of soil and groundwater contamination caused by a release of petroleum from a UST.  Funds from the Commercial Leaking Underground Storage Tank Fund will pay up to $1.5 million of "reasonable and necessary costs directly related to the cleanup of a release."  *See* N.C.G.S. §§ 143-215.94A-P.  To be eligible, an owner/operator must have paid all annual operating fees on properly registered commercial tanks and must be in compliance with all applicable state UST rules.  *Id*.

[7]     If naturally occurring substances exceed the specified standard, the standard is "the naturally occurring concentration as determined by the Director."  15A NCAC 02L .0202(b)(3).

If two or more contaminants exist in combination, the Director of the Division of Environmental Management ("Director") must consider "the effects of chemical interactions" and may specify maximum concentrations at amounts lower than those specifically set by the Rule.  15A NCAC 02L .0202(b)(2).  If no concentration level is specified for a given substance by the Rule and if that substance is not naturally occurring, as a general rule that substance is not permitted at all in detectable concentrations in either Class GA or Class GSA groundwaters.  15A NCAC 02L .0202(c).

[8] Other common sources of MTBE contamination include "the discharge of unburned fuels from water craft; gasoline spills from automobile and truck accidents; gasoline spills and drips when refueling automobiles and other machines; plus leaks from pipelines and aboveground storage tanks."  *Pollution of Underground Water Sources—Common Law Liability and Private Rights of Action*, 94 Am. Jur. Trials 1 § 103.

[9]     In the report, GMA noted that its opinions as to the likelihood that the Ballard Site is the source of the Broad Creek

contamination needed to be "better qualified and quantified." Plaintiffs did identify this report as an expert report upon which they would rely—perhaps because of the qualifications.

[10]   The Morton family includes Plaintiffs Virginia Morton, Deanna Echtmann, Linda Barnett, Samantah Barnett, Chris Barnett, and Megan Willis. The Lewis family includes Plaintiffs Margaret Lewis, Albert Lewis, and Christel Geier. The Beall family includes Plaintiffs Elizabeth Beall, Natahn Golden, and Amber Engleby. The Defeo family includes Plaintiffs Jennifer Defeo, Frederick Defeo, and David Defeo.

[11]   Additionally, the Court of Appeals reasoned that the "ultimate and intended use" of the EIFS was realized upon the application of the material to the house exterior. Therefore, when the EIFS was sold to the subcontractor who applied the material, the statute of repose began to run. The ultimate and intended use of the gasoline was to be sold and used by consumers. Therefore, the statute of repose began to run when the product was sold to the First Stop proprietors who intended to sell the gasoline to consumers.

[12]   The Court notes here that a specific schedule for disclosure of expert opinions had been set by the Court in order to avoid surprise and shifting expert opinions. Plaintiffs were required by the Case Management Order to identify their experts and the expert opinions upon which they would rely so that defendants could prepare and disclose to Plaintiffs any rebuttal expert opinions. This phase of discovery was specifically intended to produce all the evidence, expert or otherwise, with respect to when and how Plaintiffs' well water supplies had been impacted. *See* Case Management Order (June 10, 2004).

[13]   According to the Complaint and the evidence compiled by Plaintiffs thus far, the only alleged incidents involving the Ballard Defendants giving rise to a leak or spill are the August 1987 release, which resulted from a leaking flange that was quickly repaired, and the release of approximately 5.6 gallons of gasoline that was discovered by Chris Ballard in November 1990. *See supra* at ¶¶ 42-49. (Compl. ¶¶ 127-137.) No specific incidents subsequent to these have been alleged.

[14]   Regardless of the outcome of the Court's ruling on the Ballard Defendants motion *in limine*, there are material issues of fact to be determined by a jury with respect to whether a leak at the Ballard Site is the cause of contamination of Plaintiffs' wells, whether the leak, if any, has caused a continuing trespass, and when a leak, if any, occurred. Neither side is entitled to summary judgment on those issues. *See supra* ¶¶ 42-58 (setting out the parties' respective positions and evidence).

[15]   The Court notes with some amazement that although DENR had a long running feud with Mr. Ballard and had taken the public position that the Ballard Site was a source of well contamination and that there were monitoring wells on site, the DENR representatives present apparently took no pictures or notes and prepared no report with respect to the tank removal or the soil conditions around the tank.